70 A.3d 602

MICHAEL BATTAGLIA, PLAINTIFF–RESPONDENT AND CROSS-APPELLANT, v. UNITED PARCEL SERVICE, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND WAYNE DECRAINE, DEFENDANT.

Argued April 17, 2013—Decided July 17, 2013.

520

522

*Michael T. Bissinger* argued the cause for appellant and cross-respondent (*Day Pitney,* attorneys; *Mr. Bissinger* and *Joshua A. Polak,* on the briefs).

*Maureen S. Binetti* argued the cause for respondent and cross-appellant (*Wilentz, Goldman & Spitzer*, attorneys; *Ms. Binetti* and *Stephanie D. Gironda*, on the briefs).

Justice HOENS delivered the opinion of the Court.

Plaintiff Michael Battaglia was a long-term employee of defendant United Parcel Service, Inc. (UPS), serving in a variety of positions and eventually reaching the supervisory ranks. Although he accepted a change in his position with UPS that involved his temporary relocation to another state, he soon returned to New Jersey and, as a result, became a subordinate to defendant Wayne DeCraine, a man he had formerly supervised.

In September 2005, plaintiff was demoted for reasons that are not only disputed, but that are the centerpiece of the matter now before the Court. Plaintiff contends that his demotion was retaliatory because it was the company's response to complaints he made both orally to DeCraine and in an anonymous letter to Human Resources personnel at the corporate office. UPS asserts that the demotion was justified by plaintiff's violation of company confidentiality policies, his abusive treatment of other employees, and insubordination.

Plaintiff's complaint, which originally named UPS and DeCraine as the defendants, raised a variety of statutory and common law grounds on which plaintiff asserted he was entitled to relief. Some of those claims were dismissed by the trial court, and following a lengthy and contentious trial, the jury returned a verdict in plaintiff's favor on the claims that remained. Post-verdict applications resulted in a partial remittitur and an award of attorneys' fees.

Plaintiff and UPS pursued cross-appeals that have further refined the questions that are now before this Court. The cross-appeals call upon us to consider a host of questions relating to statutes that afford protection for whistleblowers and for victims of discrimination, common law contractual claims arising in the

workplace, proofs required for emotional distress damages arising from retaliatory demotion, and remittitur.

## I.

Our recitation of the facts is derived from the four-week-long jury trial on the theories that plaintiff pursued to a verdict. In light of the fact that the jury's verdict on those issues was for plaintiff, we "view the facts in the light most favorable to [plaintiff]." *Donelson v. DuPont Chambers Works,* 206 *N.J.* 243, 248 n. 2, 20 *A.*3d 384 (2011) (citations omitted). Nevertheless, all of plaintiff's allegations were vigorously contested and we recite the contrary factual assertions as appropriate for the sake of clarity.

For purposes of our consideration of this appeal, the factual bases for the allegations in the complaint can be divided into three categories. The first allegation concerned plaintiff's complaints about offensive and inappropriate sexual and gender-based comments he attributed to his supervisor, DeCraine. The second allegation concerned plaintiff's complaint about improper business lunch practices and the related misuse of company credit cards by other employees. The third allegation related to a letter that plaintiff sent anonymously to the corporate Human Resources manager raising those and other complaints.

Plaintiff began working for defendant UPS in April 1985, when he started as a package car driver. In June 1987, he transferred to the management team and was promoted to supervisor. Thereafter, he was promoted to center manager at Bridgewater, and then, in April 1999, to division manager, in charge of the Skylands Division. In September 2001, he became division manager of the South Division, which is also referred to as the Bound Brook Division and which oversees the Bridgewater facility.

During the time when plaintiff was the Bridgewater center manager, DeCraine was a supervisor at that center, a position in which DeCraine was plaintiff's subordinate. It was while plaintiff was DeCraine's supervisor that he first heard DeCraine making derogatory remarks about women. According to plaintiff, during

that time, DeCraine made two sexually inappropriate comments about a female member of UPS's administrative staff. One related to the size of that woman's breasts and the other referred to her romantic involvement with a UPS driver. Plaintiff contends that he spoke to DeCraine about the comments, informed him that they were unprofessional, and required DeCraine, in accordance with company policy, to complete a write-up documenting the conversation.[1]

During the same timeframe, plaintiff also admonished DeCraine for another inappropriate comment about the size of the same female staff member's undergarments, but did not require DeCraine to prepare a formal write-up about that incident. According to plaintiff, DeCraine's behavior then improved and plaintiff later recommended him for a promotion.

In July 2003, plaintiff was offered, and accepted, the position of Baltimore division manager, which was in the Atlantic District. Unfortunately, after only three or four days of working in Baltimore, plaintiff became ill, displaying symptoms of Lyme Disease. His doctor ordered him to stay home and rest for about three weeks. Because of that period of absence, plaintiff formally declined the position in Baltimore and UPS selected someone else to fill it. In the meantime, UPS had also filled plaintiff's previous position as division manager in Bound Brook. When he was able to return to work, plaintiff accepted a demotion to a position as a district assessor in the North Jersey District, which he hoped would lead him back to a division manager position.

After about five weeks in that position, plaintiff was reassigned to become center manager of the Mount Olive Center, which is located in the Skylands Division. He remained there until June 2004 when DeCraine became the Skylands division manager. As

---

[1] The write-up procedure was a device that UPS used to both document violations of policy and educate employees about ways to avoid future inappropriate conduct. It attempted to help the employee to recognize the improper conduct and avoid future inappropriate conduct by having the employee write an honest account of the event.

a result, DeCraine, who had previously been plaintiff's subordinate, became plaintiff's manager, a position in which DeCraine was charged with directly supervising plaintiff.

According to plaintiff, after DeCraine became division manager, he made a number of what plaintiff viewed as inappropriate sexual comments. These remarks were made only in the presence of plaintiff and other male employees; none was made to or in the presence of any female employee.

The comments plaintiff attributes to DeCraine, each of which DeCraine categorically denies, were crude and vulgar. They included, for example, numerous instances in which he used the word "c* * *" when referring to several women; his use of the phrase "f* * *ing b* * * *" to refer to one female employee in particular; multiple occasions when he discussed different pornographic websites that he viewed at home; references to a female administrative staff member's "big tits"; expressions of his desires to engage in sexual activity with a female employee; and repeated references to an employee named "Regina" as "Vagina" instead.

Plaintiff asserts that he spoke with DeCraine about each of these comments; warned DeCraine that he would be getting himself in trouble if he continued; met with the center's supervisors who heard the remarks to emphasize that DeCraine's behavior was inappropriate; and told DeCraine that he was doing the employees he supervised a disservice by setting a bad example for them.

Plaintiff also contends that, around December 2004, several of his subordinates approached him with a rumor that DeCraine was having an affair with a female employee. Plaintiff asserts that he thereafter observed behavior he believed was consistent with that rumor, as a result of which he confronted DeCraine and told him that the behavior was inappropriate.

In addition to the complaints that plaintiff made about DeCraine's sexually inappropriate remarks and behavior, plaintiff contends that he complained to DeCraine about practices in the

South Division relating to misuse of company credit cards. Plaintiff, who could not recall precisely the words he used during his disclosure to DeCraine, testified at trial that on one occasion in 2004 he told DeCraine that there were "improprieties on the . . . credit card usage in the Bound Brook facility." Although plaintiff did not elaborate during his direct testimony on what that meant, when he was cross-examined plaintiff explained that he had heard, and told DeCraine, that one or more of the managers in that Division "were going out for liquid lunches and abusing the UPS credit card[,]" and that they were not returning to work. At trial, plaintiff referred to these practices as "fraudulent use" of the company credit card or as "some possible fraud[,]" and as "improprieties on the credit card[.]"[2] However, plaintiff conceded on cross-examination that in his 2004 conversation with DeCraine, he did not refer to the credit card misuse as fraud and that he did not believe that it was fraudulent.[3]

Plaintiff testified that he never witnessed misuse of company credit cards, asserting instead that it was "brought to [his] attention." However, as part of his proofs at trial about these credit card practices, plaintiff introduced testimony from Paul Armstrong, who had been a South Division employee during 2004 and had been one of plaintiff's subordinates when plaintiff was South Division manager. Armstrong testified that he told plaintiff that he had heard about South Division employees drinking at lunch, but Armstrong did not recall discussing any other improper credit

---

[2] At trial, plaintiff's counsel questioned another UPS employee about whether she was aware that the litigation included "an allegation that high level managers improperly used their UPS corporate credit card, a violation of UPS policy, and misrepresented to the company what the charges were for." Although the witness conceded that was an allegation, plaintiff offered no evidence to support the suggestion that such practices amounted to fraud nor did he testify that he believed them to be fraudulent.

[3] During redirect examination at trial, plaintiff responded affirmatively to a question that if employees were "improperly characterizing expenses" it could be characterized as fraud, but he did not assert that he was aware of that practice or that he complained about it.

card use with plaintiff. He explained during his testimony that the corporate credit card was used to purchase after-work drinks even when business was not discussed and that expenses were split among several credit cards to avoid complying with UPS reporting policies. Armstrong admitted at trial, however, that he did not have a thorough enough understanding to testify about whether these practices actually violated any UPS policies governing credit card use.

DeCraine denied that plaintiff ever spoke to him about UPS employees abusing their company credit cards, as did North Jersey District Manager Craig Wiltz, who testified that plaintiff's complaints about any alleged improprieties in the South Division were not reported to him.

The third factual basis for the allegations in plaintiff's complaint relates to an anonymous letter he sent to UPS's corporate Human Resources manager in January 2005. The letter itself asserts that it was written anonymously "because of the threat of retaliation." It alleged that there was a wide variety of activities in the North Jersey District that plaintiff believed were improper.

Although the letter is not very specific, and includes many references to things that are irrelevant to the claims in plaintiff's complaint, it does include observations that are germane to this appeal. The letter alleges, for example, that the "leaders of the district used langu[age] you wouldn't use with your wors[t] nightmare[,]" which plaintiff asserts was a way to refer to DeCraine's inappropriate gender-based comments. The letter also included a general statement about "so many examples [of] poor and unacceptable, unethical behavior[,]" which he contended at trial was a reference to the improper use of the UPS credit cards.

Human Resources personnel at UPS quickly commenced an investigation into the allegations included in the anonymous letter, assigning the task to the North Jersey District Human Resources Manager Regina Hartley. As part of her investigation, Hartley spoke with David Lovell, the North Jersey District's employee relations manager, and Operations Manager Lou Rivieccio. Hart-

ley also discussed the letter with Wiltz because the letter specifically complained about his leadership style. Hartley testified that she found it difficult to investigate some of the letter's complaints in detail because they were so broad and non-specific. However, she found nothing in the letter that suggested that inappropriate sexual language was being used nor did she understand the letter to assert that there was any improper use of corporate credit cards.

After Hartley completed her investigation of the anonymous letter and submitted her report about it, she happened upon an unrelated document that plaintiff had written. Comparing the two, she came to believe that plaintiff was the author of the anonymous letter and she shared her belief with Wiltz.

Plaintiff testified that he never learned about any action being taken in response to his anonymous letter. However, he contends that DeCraine and others, including Wiltz, were aware of the letter. He testified that DeCraine mentioned the letter and asked plaintiff if he had written it, an assertion that DeCraine denied. Plaintiff also testified that Wiltz made a sarcastic comment to let plaintiff know that his complaint was not truly anonymous.

In the interest of creating a full account of the matters raised at trial, we briefly address three incidents involving plaintiff that were relevant to the defense. First, in 2004, plaintiff started to express concern to DeCraine about the South Division, where plaintiff had previously been the division manager. He began by pointing out that division's poor performance to DeCraine and by offering to help it improve. According to DeCraine, plaintiff spent his time reviewing reports that UPS produced about the South Division, circling numbers indicating areas of poor performance and leaving them on DeCraine's desk.

DeCraine viewed this conduct as an "obsession with the [results of] the [S]outh [D]ivision[,]" behavior that was both "undermining" to that division and that distracted plaintiff from his own responsibilities. After a few weeks of this behavior, DeCraine ordered plaintiff to stop, a directive with which plaintiff complied. De-

Craine, however, documented the behavior by placing a memo in plaintiff's file and he reported it to Wiltz.

Second, in March 2005, plaintiff heard that a female UPS driver had failed to report an accident in which she had been involved. His effort to discipline the driver led her to file a grievance against him, in which she accused him of creating a hostile work environment. She asserted that plaintiff yelled at her in an abusive manner when he confronted her about the accident and gave her a termination notice.

Moreover, the driver and DeCraine testified that, during a meeting that was convened to discuss her grievance, plaintiff was belligerent, yelling at her and reducing her to tears. DeCraine testified that he then quickly ended the meeting, reprimanded plaintiff, documented the incident for plaintiff's file, reported it to Wiltz, and rescinded the female employee's termination notice. Plaintiff, in contrast, testified that the meeting became hostile when union officials who were present berated him and that he simply responded in kind. He denies that DeCraine reprimanded him but admits that his behavior was not professional.

The third incident flowed from an internal management meeting called to review performance in safety and efficiency, which UPS refers to as a "balance score card review." During the meeting, Wiltz pointedly questioned Steve Lagnese, the new manager of the Bridgewater Center in the South Division, about the performance of his operation. Lagnese, who was unprepared for the questioning, revealed that he had sent a supervisor out to observe Chris Debbie, the union shop steward, as he delivered packages. Lagnese also reported that while being observed, Debbie had completed his route in a time that was an hour shorter than he normally took.

Two things happened thereafter. The first was that, according to Lagnese, plaintiff walked past him during a lunch break and made a sarcastic comment about the report that Lagnese had given. Although the incident was corroborated by another South Division center manager, plaintiff denies making the comment.

The second thing that happened was that Debbie, who was not present at the meeting, learned about what Lagnese had said and was apparently upset. South Division employees suspected that plaintiff had leaked the information to Debbie, and two of them testified that Debbie confirmed that their belief was correct. Plaintiff denies leaking any information to Debbie, but the two who believed that he was the source of the leak reported it to South Division Manager Gary Sanderson. Sanderson, in turn, presented his concerns about plaintiff's behavior to Operations Manager Rivieccio, who reported it to Hartley.

Hartley, assisted by Security Manager Chris Wheeler, then conducted an investigation. District leaders viewed this leak as a serious internal security matter because it could adversely affect whether managers were honest about their employees during performance reviews. In addition, they were concerned about a possible adverse impact on labor-management relations in light of Debbie's position as union shop steward.

Debbie refused to tell the investigators who the leak was, other than that his source was someone who was at the meeting, and he continued to refuse to reveal his source during his deposition. At trial, however, Debbie testified that plaintiff was the source of the leak and that he warned plaintiff about the investigation.

On September 22, 2005, Hartley and Wheeler interviewed plaintiff as part of their investigation. According to Hartley, before they even questioned plaintiff, he volunteered that Debbie had called to tell him that Steve Lagnese accused plaintiff of leaking information to Debbie. Hartley testified that plaintiff also told them that he believed Lagnese was slandering him and suggested that Lagnese might have leaked the information. Hartley and Wheeler then brought DeCraine into the meeting, who reported about an earlier meeting he had had with plaintiff concerning the leak and plaintiff's conversation about it with Debbie. At the end of the meeting, with Wiltz's approval, plaintiff was placed on paid leave pending further investigation.

Hartley next reviewed a file that DeCraine had been keeping about plaintiff's conduct, particularly as it related to plaintiff's complaints about the operations and performance in the South Division. She also reviewed documentation of a December 2004 incident during which plaintiff was accused of making a snide, disruptive remark and storming out of a meeting and the March 2005 grievance accusing plaintiff of creating a hostile environment. All of these incidents led Hartley to believe that plaintiff was engaging in a pattern of poor behavior.

On October 4, 2005, plaintiff was summoned to meet with Hartley, Wheeler, Rivieccio, and DeCraine. They assert that they intended to require plaintiff to acknowledge his misconduct and, in accordance with UPS policy, to prepare a written statement of his behavior and to commit to change his attitude in the future. They further assert that UPS planned to bring plaintiff back to work the next day. During the meeting, Hartley told plaintiff that the group believed that his pattern of behavior was inappropriate, that they believed he was the person who leaked information to Debbie, and that Wheeler, DeCraine, and Rivieccio all wanted to fire him.

Hartley asserts that when she asked plaintiff to do the write-up, he was "cavalier and dismissive" and that he twice prepared write-ups that were inadequate because they failed to specifically identify the inappropriate behavior. According to Hartley, when plaintiff was confronted with these shortcomings, he jumped out of his chair and recanted all that he had written. Plaintiff was then asked to go home and he remained on paid leave.

Following the October 4 meeting, Hartley and Rivieccio recommended to Wiltz that UPS demote plaintiff from manager to supervisor because of the pattern of improper behavior. Wiltz and Moises Huntt, the region's Human Resources manager, approved that decision. Hartley testified that she, Wiltz, and Rivieccio were the ultimate decision-makers and that DeCraine was not part of the demotion decision. However, on October 6, DeCraine, following a script written by Hartley, informed plaintiff that he

was being demoted and was being reassigned to a supervisor position.

Plaintiff believed the real reason for his demotion was the anonymous letter that he had sent. Plaintiff described his emotional state after the October 4 meeting as "a severe depression." After the demotion, he described himself as being very upset, emotionally, physically, and mentally. Plaintiff testified that he was diagnosed with depression, that a previously prescribed dose of antidepressants was increased several times, and that he missed five months of work as a result. At the time of trial, plaintiff was still under medical treatment. Plaintiff's wife, who described plaintiff as "depressed" and "unbelievably upset[,]" testified that he was "not the same person" after his demotion.

## II.

Plaintiff's complaint alleged that his demotion was in retaliation for the complaints he had made about practices and behaviors in the workplace, and he sought to recover damages on five theories, three of which are relevant to the appeal before this Court.

First, plaintiff asserted that his demotion violated the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-1 to -14, because it was in retaliation for the complaint he voiced about the improper use of credit cards. Second, he contended that the demotion violated the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -42, because it was in retaliation for his complaints about DeCraine's offensive and derogatory comments about female employees and his affair with a subordinate. Finally, he claimed that the demotion represented a breach of contract because it was contrary to assurances in personnel manuals that employees would not be disciplined for raising complaints about improper activities.

## A.

At trial, following the close of plaintiff's evidence, defendant moved to dismiss all three counts. The trial court denied the

dismissal motion as it related to the CEPA count and the LAD count, permitting them to be submitted to the jury. However, the court dismissed the breach of contract claim, giving two reasons for that decision.[4]

As the trial court explained, the contract claim was based on a theory of implied contract arising from language contained in UPS's employee manuals. *See Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 285–86, 491 *A.*2d 1257 (1985) (establishing grounds for finding implied contract in context of at-will employment relationship); *cf. Nicosia v. Wakefern Food Corp.,* 136 *N.J.* 401, 412–15, 643 *A.*2d 554 (1994) (explaining limitation on implied contract theory based on clear and prominent disclaimers). The court's first reason for dismissing the claim was that it found the disclaimers in the manuals to be sufficiently prominent and clear to avoid creating any contractual liability. Second, the court concluded that plaintiff had not proven that the intent of any party was that the employee manuals would create contractual rights.

As a result of the court's decision denying the motion to dismiss the CEPA and LAD counts, those claims became the focus of a vigorous debate between the parties about the manner in which the court should instruct the jury. Because that debate, and the court's decisions about the jury charge, give rise to many of the issues that are now before this Court, we describe them in some detail.

Principal among the debates between the parties was the manner in which the court should charge the jury on the CEPA claim. The essence of that debate concerned how the court would describe the factual assertions that were relevant to the CEPA claim. When the court first proposed language for the charge

---

[4] Plaintiff's complaint named DeCraine, who was his supervisor at the time of his demotion, and UPS as defendants. At the conclusion of the trial, the court dismissed the claim against DeCraine individually. For purposes of this opinion, we shall refer to UPS as the defendant and we refer to DeCraine only when describing the acts that plaintiff attributed to him in the complaint or during the trial.

that generally referred to the fact that plaintiff "complained of activity that [plaintiff] ... reasonably believed was fraudulent," defendant argued that the only activity plaintiff complained about that could give rise to a CEPA claim was the claim that the employees' use of credit cards was a form of fraud. Plaintiff took the position that the fraud claim was broader and included the related activities of "drinking at lunch, using [the company credit card] for improper purposes, [and] staying out all afternoon [which would] also constitute fraud."

Throughout several ensuing discussions with the court, the parties maintained their positions about the breadth of the factual allegations that could support a recovery under CEPA and, by extension, the way in which the court should describe those allegations to the jury. Eventually, the court agreed in general with plaintiff, and instructed the jury that the activities about which plaintiff complained that were relevant to his CEPA claim as follows:

> Here, you have heard testimony that certain employees of UPS were engaged in conduct or activity, which Mr. Battaglia believed was fraudulent. Mr. Battaglia alleges that he was demoted because he objected to those activities, policies[,] or practices which he reasonably believed were fraudulent.
>
> . . . .
>
> Now, as I recall the evidence—but your recollection will govern—dealt with credit cards, dealt with meal practices and other things. And he reasonably believed that what was going on in connection with those activities were fraudulent.

Because the court's instruction to the jury used the phrase "and other things" in describing the basis for the CEPA claim, defendant has contended on appeal that it left the jury free to speculate that the CEPA recovery could be supported by practices other than ones that would qualify as fraudulent within the meaning of the statute.

In addition, there were two issues relating to plaintiff's claim for emotional distress damages that were the subject of debate between the parties during the charge conference. The first was directed to whether plaintiff was entitled to have the jury consider his life expectancy in determining the quantum of an emotional distress award. The second concerned whether plaintiff was

entitled to have the jury told that he did not need to present expert testimony to prove that he had suffered emotional distress.

After hearing the parties at length on the subject, the court charged the jury by using language that was generally in accordance with the model jury charge for personal injury damages. *See Model Jury Charge (Civil)* § 8.11E, "Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (1996). Therefore, the court referred to "personal hardship, including emotional distress" and referred to "fair and reasonable money damages for the full extent of the harm caused." In explaining how to measure damages, the court directed the jury to

> consider Mr. Battaglia's age. He is still 51.... [Consider h]is usual activities, his occupation, his family responsibilities[,] and other relevant facts that you have heard from the evidence, in evaluating the probable consequence of any harm that he sustained. Consider their duration.

As part of the charge on damages, the court also gave a life expectancy charge, using language substantially similar to the model jury charge. *See Model Jury Charge (Civil)* § 8.11G, "Life Expectancy" (1996). The court therefore instructed the jury that in evaluating the amount of future damages, the jury should consider plaintiff's life expectancy of 30.3 years. Neither party offered an objection after the court completed reading the charge to the jury.

During deliberations, the jury requested clarification on two issues. Its first question related to the LAD claim, and asked the court to "please explain protected activity." The trial court responded that "in this case, protected activity under the LAD is objecting to or complaining about sexual or gender based comments or offensive sexual conduct in the work place, which Mr. Battaglia either observed or reasonably believed occurred."

The jury's second question related to the CEPA claim, and requested a definition of "the term fraudulent[.]" The court responded by providing the jury with three definitions of fraud. The first two came from a dictionary and a law dictionary, respectively, and the third was taken from language added to CEPA after the time of the events in dispute. *See N.J.S.A.* 34:19–

3(c)(2) (adding that fraud includes "any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud . . . the employer").

The jury returned its verdict on February 27, 2009. It found defendant liable on both the CEPA and the LAD claims, and without distinguishing between them, awarded plaintiff $500,000 in economic damages and $500,000 in personal hardship and emotional distress damages.

Defendant moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial or an order vacating or remitting the damage award. In a written opinion, the trial court denied defendant's motion for JNOV or a new trial, and upheld the jury's CEPA and LAD liability verdicts. However, the court concluded that the emotional distress damage award was excessive because it was the equivalent of five years of income, because there was no evidence that plaintiff's distress was severe, and because plaintiff failed to present any expert testimony to support his medical complaints.

The trial court's remittitur analysis consisted of reciting for comparison three published Appellate Division decisions reviewing awards that were in far lesser amounts than the $500,000 emotional distress verdict in plaintiff's favor. *See Klawitter v. City of Trenton,* 395 *N.J.Super.* 302, 323–25, 335–36, 928 *A.*2d 900 (App. Div.2007) (reviewing emotional distress award of $79,538 for reverse race discrimination based on plaintiff's testimony that not being promoted left her "crushed"); *Kluczyk v. Tropicana Prods., Inc.,* 368 *N.J.Super.* 479, 484–87, 847 *A.*2d 23 (App.Div.2004) (affirming emotional distress award of $20,000 in sex-based discrimination case based on testimony about being taunted and being compelled to take two-month leave of absence); *Maiorino v. Schering–Plough Corp.,* 302 *N.J.Super.* 323, 341, 695 *A.*2d 353 (App.Div.1997) (reviewing award of $55,000 for pain, suffering and humiliation in employment termination case), *certif. denied,* 152 *N.J.* 189, 704 *A.*2d 19 (1997). Based on that alone, the trial court concluded that the jury's award was inappropriate and remitted it

to $205,000. The court explained that sum would represent "approximately two years of gross income for Mr. Battaglia."

## B.

In cross-appeals filed in the Appellate Division, defendant asserted that the trial court erred in denying its motion for JNOV or a new trial on the LAD and CEPA verdicts and plaintiff argued that the trial court erred in dismissing the implied contract claim and remitting the damage award for emotional distress.[5] In an unpublished opinion, the Appellate Division affirmed in part, reversed in part, and remanded the matter for further proceedings.

First, the appellate panel rejected defendant's challenge to the CEPA verdict. That challenge was based on defendant's arguments that there was no evidence that Battaglia believed that the credit card conduct about which he complained was fraudulent; that there was no evidence that there was any causal connection between plaintiff's single conversation with DeCraine about the credit cards and his demotion; that plaintiff had failed to demonstrate that the reasons offered by UPS for his demotion were pretextual; and that the jury charge erroneously permitted the jury to base its decision on conduct that was not complained about or was not protected activity within the meaning of CEPA.

The appellate panel rejected each of the CEPA-based arguments. First, the panel reasoned that there was sufficient evidence for the jury to decide that plaintiff reasonably believed that the credit card use was fraudulent and to conclude that the reasons offered by UPS for the demotion were pretextual. Second, the appellate court concluded that the causal link between the complaint and the demotion could be supplied by application of the

---

[5] The cross-appeals raised a wide variety of other challenges to the conduct of the trial, the verdict, the judicial determinations embodied in the judgment that was entered and the court's analysis of the post-verdict motions. We limit our recitation of the issues addressed on appeal, however, to the ones that are now before this Court through our decision to grant the cross-petitions for certification.

cat's paw theory, *see Staub v. Proctor Hosp.*, — *U.S.* —, 131 *S.Ct.* 1186, 179 *L.Ed.*2d 144 (2011), and that there was sufficient evidence to support that theory in the record.

Addressing defendant's attack on the jury charge, the Appellate Division conceded that the charge was flawed because it "did not clearly outline for the jury the parameters of plaintiff's CEPA claim and which of plaintiff's complaints could be entitled to protection under CEPA and which might not." The panel also recognized that complaints about some of the behaviors, including drinking at lunch or taking longer-than-usual lunch breaks, would not merit CEPA protection. Nevertheless, the Appellate Division rejected defendant's challenge to the jury instructions on the CEPA claim, finding that defendant had waived the objection by failing to assert it after the charge was given and concluding that the error in the charge fell short of constituting plain error. *See R.* 2:10–2.

Second, the panel agreed with defendant's challenge to the LAD verdict, reversing it and entering judgment on that count in defendant's favor. Reasoning that there was no evidence that any of the gender-based comments were heard by women, and that there was no evidence of disparate treatment of women or of a hostile work environment, the appellate court concluded that there could be no cognizable claim that there had been discrimination as defined by the LAD. *See N.J.S.A.* 10:5–12(d). Furthermore, to the extent that plaintiff based his LAD retaliation claim on his complaint about the inappropriate personal relationship between DeCraine and his female co-worker, the panel concluded that the unrebutted evidence revealed it to be a consensual relationship and plaintiff's complaint about it was therefore not cognizable under the LAD. *See Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 559, 569 *A.*2d 793 (1990).

Third, the Appellate Division found merit in defendant's attack on the emotional distress award. The appellate panel concluded that the trial court erred by permitting the jury to include future damages in its emotional distress award without expert evidence

that plaintiff's emotional distress was permanent. The appellate court therefore remanded the emotional distress damage award for further proceedings without considering plaintiff's argument that the trial court's remittitur of that award was in error.

Finally, the Appellate Division summarily rejected the argument, raised in plaintiff's cross-appeal, that the trial court erred in dismissing the implied contract claim. The panel observed without elaboration that it agreed with the trial court's analysis and commented that the question was moot in light of the fact that the only damages that could be recovered for breach of an implied contract were coextensive with the damages that plaintiff had been awarded.

Both parties filed motions for reconsideration. Defendant argued that the panel erred in finding that it had waived its objection to the court's jury charge on CEPA in light of the extensive colloquy on the proposed charge during which defendant voiced its objection twice on the record. Plaintiff asserted that the appellate court erred in its analysis of what constitutes protected activity for purposes of a retaliation claim brought pursuant to the LAD and in its analysis of the proofs that were needed to support the emotional distress award. The Appellate Division summarily denied both motions.

### III.

We granted the cross-petitions for certification filed by both plaintiff and defendant. 209 *N.J.* 232, 36 *A.*3d 1064 (2012).

Defendant's petition presented four questions, all directed to the CEPA claim. First, defendant contends that the sole basis for plaintiff's CEPA claim must be the alleged oral notice to DeCraine about the use of credit cards, because the anonymous letter did not identify any activity relating to credit cards or fraud or any activity that, had it been complained about, would be protected by CEPA. Therefore, defendant argues that the Appellate Division erred in concluding that the CEPA claim could be sustained by the complaints in the anonymous letter.

Second, defendant argues that plaintiff's candid concession at trial that he did not believe that the activities relating to the credit cards and the luncheons amounted to fraud should have been dispositive on the CEPA claim, requiring that the verdict be vacated for lack of an essential element of proof.

Third, defendant asserts that once the appellate panel concluded, as it did, that the jury charge relating to the CEPA claim was in error and that the evidence on which plaintiff relied did not identify activities that CEPA protects, it should not have sustained the CEPA verdict. Defendant further argues that the panel's reasoning that defendant waived its objection by failing to object to the jury charge ignored defendant's repeated, unsuccessful challenges to the several versions of the proposed charge, and erroneously required that the objection be reiterated after the court had rejected it.

Finally, defendant contends that the CEPA verdict cannot be sustained because, at most, plaintiff complained about behavior that amounted to violations of internal company policies rather than about activities that amount to fraud within the meaning of the statute. Defendant asserts that it was error for the panel to sustain the verdict after conceding that it was "difficult to conclude that a complaint that some employees were drinking at lunch or taking extended lunch hours constitutes protected activity under CEPA."

Plaintiff's cross-petition also presented four questions. First, plaintiff argues that the Appellate Division incorrectly concluded that the gender-based statements about which he complained did not constitute unlawful discrimination within the meaning of the LAD. Plaintiff urges this Court to reject the panel's conclusion that there can be no gender discrimination unless the offensive comments were heard by a woman or were sufficient to create a hostile environment and asks us to conclude instead that plaintiff's complaints about the offensive language sufficed to support his LAD verdict.

Second, plaintiff argues that the appellate panel applied the incorrect standard to plaintiff's LAD claim, contending that the correct standard to be applied is whether he had a good faith, reasonable belief that the conduct about which he complained violated the LAD. Plaintiff therefore asserts that the panel erred in vacating the LAD verdict and asks this Court to reinstate it.

Third, plaintiff argues that the appellate court improperly reversed and remanded the emotional distress damage award. He contends that the panel erred in concluding that the trial court erroneously permitted an evaluation of the plaintiff's life expectancy, describing the court's charge in this regard as being limited to the award for economic damages. Plaintiff further urges this Court to reject the contention that an emotional distress award must be supported by expert evidence of permanency and urges us to conclude that the evidence supporting the award was sufficient. Further, plaintiff asserts that the trial court's remittitur analysis was flawed and requests that we reinstate the full measure of the jury's emotional distress award.

Finally, plaintiff argues that the Appellate Division erred in its analysis of the implied contract claim. He contends that the disclaimers in the employment manuals were insufficiently clear and prominent, *see Nicosia, supra,* 136 *N.J.* at 412, 643 *A.*2d 554; *Woolley, supra,* 99 *N.J.* at 285–86, 491 *A.*2d 1257, to protect defendant from an implied contract claim. He therefore contends that the appellate panel applied the incorrect legal standard to the breach of implied contract claim and asks this Court to reinstate that cause of action and remand it for trial.

## IV.

The cross-petitions require us to address virtually every count asserted in plaintiff's complaint, encompassing the parties' disputes about LAD, CEPA, implied contract, and emotional distress damages. We begin our analysis with plaintiff's LAD claim.

■ Plaintiff asserted that his demotion violated the LAD because it was in retaliation for his complaints about DeCraine's use of offensive, vulgar and derogatory language when referring to women and about his purported affair with a female employee. Although the jury returned a verdict for plaintiff on this claim, the Appellate Division overturned that award, concluding that absent an impact on a female employee, plaintiff's complaints did not constitute protected activity under the LAD and therefore were not actionable.

We begin with a recitation of the relevant principles of law. It is well-established that the LAD's overarching goal is the "eradication 'of the cancer of discrimination[,]' " *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652 (quoting *Jackson v. Concord Co.*, 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)), *cert. denied*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). In striving to be faithful to the clear will of the Legislature, we have recognized and given effect to the LAD's broad remedial purposes. *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 603–04, 626 *A.*2d 445 (1993); *see Quinlan v. Curtiss–Wright Corp.*, 204 *N.J.* 239, 258–59, 8 *A.*3d 209 (2010) (stating principles and statutory purposes).

As such, we have recognized that "[f]reedom from discrimination is one of the fundamental principles of our society[,]" *Lehmann, supra*, 132 *N.J.* at 600, 626 *A.*2d 445, and we have described sex-based discrimination as being "peculiarly repugnant in a society which prides itself on judging each individual by his or her merits[,]" *Grigoletti v. Ortho Pharm. Corp.*, 118 *N.J.* 89, 96, 570 *A.*2d 903 (1990) (quoting *Peper v. Princeton Univ. Bd. of Trs.*, 77 *N.J.* 55, 80, 389 *A.*2d 465 (1978)).

■ The LAD makes it illegal "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act[.]" *N.J.S.A.* 10:5–12(d). All LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism. *See McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 802–04, 93 *S.Ct.* 1817, 1824–25, 36 *L.Ed.*2d 668, 677–79 (1973); *Andersen v. Exxon Co.*,

89 *N.J.* 483, 492–93, 446 *A.*2d 486 (1982). When the claim arises from alleged retaliation, the elements of the cause of action are that the employee "engaged in a protected activity known to the [employer,]" the employee was "subjected to an adverse employment decision[,]" and there is a causal link between the protected activity and the adverse employment action. *Woods–Pirozzi v. Nabisco Foods,* 290 *N.J.Super.* 252, 274, 675 *A.*2d 684 (App.Div. 1996). In addition, in order to recover for LAD retaliation, plaintiff must also demonstrate that the original complaint was both reasonable and made in good faith. *Carmona v. Resorts Int'l Hotel, Inc.,* 189 *N.J.* 354, 373, 915 *A.*2d 518 (2007).

In overturning the LAD verdict, the Appellate Division observed that the LAD prohibits an employer from discriminating against an employee because of his or her sex, *N.J.S.A.* 10:5–12(a), and that it prohibits taking reprisals against any person who opposes practices forbidden under the statute, *N.J.S.A.* 10:5–12(d). Reading those two provisions together, the appellate panel reasoned that although the statute protects anyone who voices opposition, unless that person opposes an act of discrimination or a hostile work environment, the objector cannot recover for retaliation. Because there was no evidence in the record of actual discrimination against women or a hostile environment as it related to women, the appellate court found no ground for plaintiff to challenge what the jury concluded was a retaliatory demotion.

[5] We do not read the LAD to permit such a narrow interpretation. Instead, we consider the matter before us in accordance with the broad remedial purposes that the LAD is designed to achieve. We therefore begin by considering the record in its context and, although both the corporate representatives who testified in general, and DeCraine in particular, vigorously denied plaintiff's allegations, if the jury credited them, as it plainly did, our role is to decide whether the evidence is sufficient to sustain that verdict in accordance with the applicable principles of law.

We accept as true, therefore, that DeCraine actually used the offensive language that plaintiff attributed to him and that he used

it both when he was plaintiff's subordinate, for which he was required to prepare a written account in lieu of discipline, and when he thereafter became plaintiff's supervisor. The language attributed to DeCraine is particularly vile, demeaning and offensive, bespeaking attitudes and views about women that have no place in a work setting. We accept as true that plaintiff actually voiced his complaints about that language to DeCraine, both individually and in front of others, and that he referred to its use in the anonymous letter that he sent to the corporate headquarters.

Viewing the record as a whole, we cannot endorse the appellate panel's conclusion that plaintiff's complaints about DeCraine's language did not constitute protected activity within the meaning of the LAD. First, we agree that there is no claim and no evidence in the record to suggest that any of the language used was overheard by any women or uttered in the presence of any women. We therefore recognize that there is no claim that any particular woman could demonstrate that she was directly discriminated against or was subjected to a hostile work environment.

We, however, do not share the Appellate Division's understanding that the LAD only protects those who voice complaints about directly demonstrable acts of discrimination. On the contrary, as this case makes plain, the broad purposes of the LAD would not be advanced were we to apply so narrow a focus. These were not the occasional words of a low-level employee having a bad day, but were the words of a supervisor, uttered in meetings attended by managerial employees, both repeatedly and routinely. Nor were they directed to a single female employee with whom DeCraine had a dispute or disagreement, but were directed to and about numerous women, including Hartley, the woman charged with investigating and addressing the complaints made in the anonymous letter.

■ Second, when an employee voices a complaint about behavior or activities in the workplace that he or she thinks are discriminatory, we do not demand that he or she accurately

understand the nuances of the LAD or that he or she be able to prove that there was an identifiable discriminatory impact upon someone of the requisite protected class. On the contrary, as long as the complaint is made in a good faith belief that the conduct complained of violates the LAD, it suffices for purposes of pursuing a cause of action.

Third, we have explained that "[t]he LAD was enacted to protect not only the civil rights of individual aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace." *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.2d* 445; *see Fuchilla, supra,* 109 *N.J.* at 334–35, 537 *A.2d* 652 (quoting legislative declaration, *N.J.S.A.* 10:5–3, that workplace discrimination "menaces the institutions and functions of a free democratic State"). We would ill serve those important purposes were we to demand that one who voices complaints as did plaintiff in this matter, and who suffers retaliation as a consequence, also prove that there is a separate, identifiable victim of actual discrimination.

We do not suggest that the LAD has created a sort of civility code for the workplace where only language fit for polite society will be tolerated. But we find ample evidence in this record to support the jury's conclusion that plaintiff's complaints were protected activity within the meaning of the LAD and that his demotion was in retaliation for those complaints.

Our conclusion that the appellate panel erred in its understanding of the protections afforded by the LAD requires us to consider briefly the other challenges to the LAD verdict that defendant raised. Defendant asserts that neither plaintiff's complaint about DeCraine's presumed affair with a co-worker nor the statements in the anonymous letter could support a recovery under the LAD and that because the jury was permitted to consider that evidence, the verdict cannot stand. We do not agree.

The complaint about what plaintiff believed was a sexual relationship between DeCraine and another employee was protected activity. Whether the relationship was consensual or not, if

plaintiff in good faith believed that it violated company policy because it was a form of sex discrimination, then retaliation against him based on that complaint would support a recovery under the LAD. *See Roa v. LAFE,* 200 *N.J.* 555, 562–63, 985 *A.*2d 1225 (2010) (noting that plaintiff was retaliated against in part for revealing his brother's alleged extramarital romance to his brother's wife).

■ Similarly, the complaints raised in the anonymous letter, if they were the basis for a retaliatory employment consequence, would suffice for LAD purposes. Particularly relevant in this regard is the evidence demonstrating defendant's response to the anonymous letter. Some of the allegations in the letter are vague, but there are several references to workplace intimidation, unethical behavior, and fear of reprisals. To be sure, the reference in the letter to "langu[age] you wouldn't use [in] your wors[t] nightmare" is oblique, but it was sufficient to alert personnel versed in human resources and appropriate workplace behaviors of the matter to be investigated.

Rather than undertaking an investigation into the allegations and attempting to determine whether DeCraine or anyone else was engaging in behavior that might violate either our strong statutory workplace protections or the company's own code of ethics, Hartley conducted only a limited investigation and relied on her pre-existing beliefs to discount the complaints. In short, as the jury concluded, the corporate response was to take action against the individual who complained.[6]

---

[6] To the extent that defendant challenged the LAD verdict for insufficiency of a causal link between plaintiff's complaints and his demotion, we reject it. The factual record on which the jury could find that causal connection included evidence that DeCraine participated in the meeting at which the leak was discussed, that Hartley told plaintiff that DeCraine thought he should be terminated, and that DeCraine's file concerning plaintiff was reviewed and considered. *See supra* at 534–36, 70 *A.*3d at 612–13. As our discussion of parallel CEPA standard demonstrates, *see infra* at 559 & n. 10, 70 *A.*3d at 627 & n. 10, that factual record sufficed.

Our analysis of the Appellate Division's decision leads us to conclude that its narrow reading of the LAD was in error. Our review of the record and our consideration of the arguments raised on appeal in light of the meaning of the LAD as we understand it lead us to conclude that there was sufficient evidence to support the jury's verdict in plaintiff's favor on the LAD count. We therefore direct that the jury's liability and economic damages verdict in plaintiff's favor on the LAD count be reinstated.

## V.

Because we have reinstated the LAD verdict, we turn next to a consideration of the competing challenges to the jury's award of emotional distress damages and, to the extent relevant, the trial court's remittitur order. Plaintiff urges us to reverse the judgment of the Appellate Division and to reinstate the jury's full emotional distress verdict in his favor, raising three arguments in support.

First, plaintiff asserts that the appellate panel erred in concluding that the verdict included an award for permanency, arguing that the reference in the jury charge to his life expectancy related to the economic damage award rather than to his emotional distress claim. Second, he asserts that neither the LAD nor CEPA requires expert proofs to support an emotional distress award, with the result that even if the jury's award included damages for his future emotional distress, that award was grounded on adequate evidence in the record. Third, plaintiff renews the argument that he raised before the Appellate Division, arguing that the trial court erred in ordering a remittitur and contending before this Court that the full amount of the award should be reinstated.

Our review of these arguments demands that we address them in an order other than the one in which plaintiff has presented them. We begin with the assertion that a plaintiff pursuing an LAD or CEPA claim can be awarded damages for

emotional distress without offering expert testimony. Both statutes permit the recovery of an award of damages for emotional distress. *N.J.S.A.* 10:5-3 (expressing scope of damages available to redress LAD violations); *N.J.S.A.* 34:19-5 (providing that CEPA plaintiff can claim "[a]ll remedies available in common law tort actions"); *see Donelson, supra,* 206 *N.J.* at 258, 20 *A.*3d 384.

This Court has long recognized plaintiff's right to recover for emotional distress in litigation brought pursuant to the LAD, and to do so without resort to expert testimony. *See Rendine v. Pantzer,* 141 *N.J.* 292, 312, 661 *A.*2d 1202 (1995). We have commented that "[g]iven the breadth of individual and societal harms that flow from discrimination and harassment, to limit the LAD's application to only those cases in which the victim suffered, or could have suffered, serious psychological harm would be contrary to its remedial purpose." *Lehmann, supra,* 132 *N.J.* at 609, 626 *A.*2d 445. As we explained, "[i]t is the harasser's conduct, not the plaintiff's injury, that must be severe or pervasive." *Id.* at 610, 626 *A.*2d 445.

█ Drawing a distinction between the kind of emotional distress damages that the LAD permits to be recovered based on lay testimony alone and the requirements needed to recover for a common law intentional infliction of emotional distress claim, *see Tarr v. Ciasulli,* 181 *N.J.* 70, 77-82, 853 *A.*2d 921 (2004), we have explained that "the Legislature intended victims of discrimination to obtain redress for mental anguish, embarrassment, and the like, without limitation to severe emotional or physical ailments[,]" *id.* at 81, 853 *A.*2d 921. As we observed, in general, "compensatory damages for emotional distress, including humiliation and indignity resulting from willful discriminatory conduct, are remedies that require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action." *Id.* at 82, 853 *A.*2d 921.

Notwithstanding that general proposition of law, the appeal before us raises a separate question. We are required to consider whether a plaintiff can recover a verdict that includes an award

for future emotional distress in the absence of evidence of permanency in the form of an expert opinion. We have long held that a plaintiff is entitled to damages for expected future harm only "[i]f the prospective consequences may, in reasonable probability, be expected to flow from the past harm[.]" *Coll v. Sherry,* 29 *N.J.* 166, 175, 148 *A.*2d 481 (1959); *see also Mauro v. Raymark Indus., Inc.,* 116 *N.J.* 126, 133, 561 *A.*2d 257 (1989) (observing that "long-standing rule in New Jersey is that prospective damages are not recoverable unless they are reasonably probable to occur"). The rule seeks to ensure that the plaintiff will be made whole while preventing an improper award of damages based on conjecture or speculation. *Coll, supra,* 29 *N.J.* at 174–75, 148 *A.*2d 481; *see also Pomerantz Paper Corp. v. New Cmty. Corp.,* 207 *N.J.* 344, 375–76, 25 *A.*3d 221 (2011) (concluding that trial court's calculation of damages was error because it relied on speculative expert testimony).

In personal injury cases, "the plaintiff has the burden of proving the permanency or other likely duration of [his or] her injuries." *Quinlan v. Curtiss–Wright Corp.,* 425 *N.J.Super.* 335, 363, 41 *A.*3d 739 (App.Div.2012) (citing *Model Jury Charge (Civil)* § 8.11C, "Loss of Earnings" (2010)). Our Appellate Division has explicitly concluded that there is no reason to deviate from this general principle when considering the adequacy of proofs in LAD cases. *Id.* at 365, 41 *A.*3d 739. Further, that court has held that to meet this burden, plaintiff must "prov[e] permanency or reasonable duration of the injury and resultant damages caused by the defendant's unlawful discrimination or retaliation[.]" *Id.* at 364, 41 *A.*3d 739. Although the jury can consider all relevant evidence, including the plaintiff's own testimony and the testimony of any experts the plaintiff might present, the burden remains on the plaintiff to prove the duration of the damages. *Id.* at 369–70, 41 *A.*3d 739.

Reading all of these precedents together, although plaintiffs in LAD claims may be awarded damages for "humiliation, embarrassment[,] and indignity [which is] by definition to

suffer emotional distress[,]" *Tarr, supra,* 181 *N.J.* at 81, 853 *A.*2d 921 (quoting *Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.,* 360 *N.J.Super.* 265, 276, 822 *A.*2d 647 (App.Div.2003)), when supported by lay testimony alone, a future award must be supported by evidence of permanency, *Lockley v. Turner,* 344 *N.J.Super.* 1, 12, 779 *A.*2d 1092 (App.Div.2001) (noting that jury was not allowed to award damages for future emotional suffering and distress because plaintiff presented no expert testimony to prove permanency), *aff'd in part, rev'd in part on other grounds sub nom. Lockley v. State, Dep't of Corr.,* 177 *N.J.* 413, 828 *A.*2d 869 (2003). That is, although the humiliation, embarrassment and indignity suffered by the LAD plaintiff during the events complained of is obvious, once remedied through a verdict, any claim that those effects will endure so as to support a future award must be proven by credible, competent evidence lest that verdict be the product of speculation.

■ The second question that we therefore address in this matter is whether the jury's award of damages for emotional distress inappropriately included elements of a future award. Our review of the instructions to the jury leads us to conclude that it did. In explaining the way in which the award for emotional distress should be calculated, the trial court repeatedly charged the jury to consider plaintiff's age as one factor in determining the appropriate damage award. The court also included an instruction on plaintiff's life expectancy and the way in which it should be utilized in considering damages awards. Although that instruction was directly tied to the court's discussion of "personal hardship," the court made clear that personal hardship was a part of the way in which the jury should evaluate the emotional distress claim.

In the absence of any evidence about permanency, by referring to plaintiff's age and life expectancy, the trial court permitted the jury to include a future award for emotional distress, which improperly invited the jury to speculate. We therefore affirm the judgment of the Appellate Division that the emotional distress

charge was in error and that the award of damages for emotional distress cannot stand.[7]

## VI.

We turn, then, to the claims raised by defendant in its petition, all of which are focused on the CEPA verdict. CEPA was "described at the time of its enactment as the most far reaching 'whistleblower statute' in the nation." *Mehlman v. Mobil Oil Corp.*, 153 *N.J.* 163, 179, 707 *A.2d* 1000 (1998) (citation omitted). It creates a cause of action for an employee who is subjected to retaliation for reporting workplace misconduct. *Dzwonar v. McDevitt*, 177 *N.J.* 451, 461–62, 828 *A.2d* 893 (2003). As we have explained, CEPA is a remedial statute that "promotes a strong public policy of the State" and "therefore should be construed liberally to effectuate its important social goal." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 431, 650 *A.2d* 958 (1994).

At the time during which the facts that gave rise to this appeal occurred,[8] CEPA provided, in relevant part, as follows:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

---

[7] Although in light of these conclusions, we need not address plaintiff's alternate argument relating to the trial court's remittitur order, our review of the record demands that we comment. Our recitation of the trial court's reasons for the remittitur decision and the basis on which its decision was made demonstrates that the court's analysis fell woefully short of the standards we established for remittitur. *See He v. Miller*, 207 *N.J.* 230, 236, 24 *A.3d* 251 (2011).

[8] In general we apply statutes as they existed at the time the relevant facts and circumstances occurred. *See Khan v. Singh*, 200 *N.J.* 82, 100, 975 *A.2d* 389 (2009) (declining to apply statute to causes of action accruing before statute's effective date). Although the Legislature amended CEPA effective January 12, 2006, *L.* 2005, *c.* 329, § 1, to modify the phrase "fraudulent or criminal" in section 3(c), to include "any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud[,]" *N.J.S.A.* 34:19–3 (2013), we do not consider it.

c. Objects to, or refuses to participate in, any activity, policy or practice which the employee reasonably believes:

. . . .

(2) is fraudulent or criminal;

[*N.J.S.A.* 34:19-3 (2004 version).]

 The required proof elements for a CEPA action are well established:

A plaintiff who brings a cause of action pursuant to *N.J.S.A.* 34:19-3c must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[*Dzwonar, supra,* 177 *N.J.* at 462, 828 *A.2d* 893 (citations omitted).]

Because there is no dispute about the fact that a demotion meets the definition of the retaliatory action, *see N.J.S.A.* 34:19-2(e), we direct our attention to the other statutorily required elements.[9]

---

[9] As the appellate panel observed, the parties did not discuss the implications of CEPA's statutory election of remedies. *N.J.S.A.* 34:19-8 ("the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law"); *see Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 492-93, 638 *A.2d* 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.2d* 1006 (1994). By pursuing a CEPA claim, a plaintiff waives any alternative remedy that would otherwise have been available for the same retaliatory conduct, although not at the expense of pursuing other causes of action that are substantially independent of the CEPA claim. *See Tartaglia v. UBS PaineWebber, Inc.,* 197 *N.J.* 81, 103, 961 *A.2d* 1167 (2008) (holding that enactment of CEPA "did not entirely supplant" common law whistleblower remedies); *Young v. Schering Corp.,* 141 *N.J.* 16, 29, 33, 660 *A.2d* 1153 (1995).

It is possible, however, to pursue parallel claims for relief pursuant to CEPA and LAD, as could be the case, for example, if plaintiff were demoted based on a complaint about sexually inappropriate language and was also subjected to a hostile environment based on a disability, and we do not endorse the broad conclusion that a CEPA claim and a claim for retaliation brought under the LAD are always mutually exclusive. *See Ivan v. Cnty. of Middlesex,* 595 *F.Supp.*2d 425, 465-66 (D.N.J.), *recons. denied,* 612 *F.Supp.*2d 546 (D.N.J.2009).

In this case, plaintiff suffered only one adverse employment consequence, offering two bases on which the jury could conclude that his demotion was

There are three questions raised in this appeal about the sufficiency of the evidence presented in support of plaintiff's CEPA claim. The first question is whether plaintiff reasonably believed that the activities surrounding the use of credit cards amounted to fraudulent activity as defined by CEPA. The second question is whether he blew the whistle about that activity as defined in CEPA. *See N.J.S.A.* 34:19–3(c). The third question is whether plaintiff demonstrated that there was a causal connection between the demotion and the whistleblowing activity. In addition, defendant challenges the adequacy of the trial court's jury instructions on the elements of the CEPA claim.

We need not address CEPA broadly, but focus instead on the claim of fraudulent activity as the basis for a CEPA claim. There are relatively few published decisions relating to fraud as the basis for a CEPA claim, and we derive our guidance on this narrow question from those precedents.

A CEPA claim that is based on fraud, *see N.J.S.A.* 34:19–3(a)(2), –3(c)(2), can rest on allegations about the activities of a co-employee. *Estate of Roach v. TRW, Inc.,* 164 *N.J.* 598, 612–13, 754 *A.2d* 544 (2000). The focus is on whether the employee making the complaint reasonably believed that the activity was occurring and that it amounted to fraud. *Id.* at 613, 754 *A.2d* 544; *see Mehlman, supra,* 153 *N.J.* at 193–94, 707 *A.2d* 1000. The issue is not whether in fact other employees were engaged in the activity complained of or whether the activity met the legal definition of fraud. Instead, the question is whether the complaining employee had a reasonable belief that the activity was fraudulent and complained about it for that reason. *Ibid.; see also Dzwonar, supra,* 177 *N.J.* at 462, 828 *A.2d* 893 (concluding that

retaliatory, but for which he sought only one recovery as evidenced by the verdict sheet's single damage question. In order to comply with CEPA's waiver provision, plaintiff's complaint about sexually inappropriate language could have been analyzed as another form of protected activity under CEPA. *See N.J.S.A.* 34:19–3(a)(1). We caution trial judges, however, to be vigilant in order to effectuate the Legislature's mandate that alternate remedies be waived.

claim pursuant to *N.J.S.A.* 34:19–3(c)(1) does not require showing that one's "employer or another employee actually violated the law or a clear mandate of public policy").

At the same time, as we have cautioned, the court must be alert to the sufficiency of the factual evidence and to whether the acts complained of could support the finding that the complaining employee's belief was a reasonable one. That is, the statute does not protect employees whose complaints are directed to minor or trivial matters. As we have explained:

> if an employee were to complain about a co-employee who takes an extended lunch break or makes a personal telephone call to a spouse or friend, we would be hard pressed to conclude that the complaining employee could have "reasonably believed" that such minor infractions represented unlawful conduct as contemplated by CEPA. CEPA is intended to protect those employees whose disclosures fall sensibly within the statute; it is not intended to spawn litigation concerning the most trivial or benign employee complaints.
>
> [*Roach, supra,* 164 *N.J.* at 613–14, 754 *A.*2d 544.]

In addressing the quality of the proofs, the court must take care to ensure that the activity complained about meets this threshold lest CEPA be diverted from its true remedial purpose.

We have not required that there be proof of a direct causal link between the complaint by the employee and the retaliatory action of the employer. Instead, we have made two observations concerning the kind and quality of proofs that might suffice, if believed by a jury. First, we have commented that in evaluating whether an employer acted pursuant to a retaliatory motive, jurors are permitted to draw an inference from all of the circumstances relating to the decision. *See id.* at 612, 828 *A.*2d 893 (citing *Romano v. Brown & Williamson Tobacco Corp.,* 284 *N.J.Super.* 543, 550, 665 *A.*2d 1139 (App.Div.1995)).

Second, we have permitted the finder of fact to evaluate the response of the employee's supervisor to the complaint. As we have commented, where the response to an allegation of fraudulent behavior was to make inquiry of the accused employees or to ignore the complaint rather than to undertake an investigation, the jury could infer that the employer was complicit. *Id.* at 614,

665 *A*.2d 1139. In those circumstances, we observed that the jury could "find that the employer had ratified the alleged employee conduct, thereby treating the complained-about activities as the employer's own conduct in satisfaction of CEPA section 3a." *Ibid.; see Johnson v. Hosp. Serv. Plan of N.J.*, 25 *N.J.* 134, 141, 135 *A*.2d 483 (1957) (observing that "[t]he intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it").

Third, we have recognized that a jury could also find that an employee had demonstrated the requisite causal link indirectly. That is, we have concluded that proof that a supervisor who did not have the authority to subject the complaining employee to a retaliatory employment action but who prepared a biased evaluation because of the employee's CEPA-protected complaints might have sufficiently tainted the view of the actual decision maker to support relief. *Id.* at 612, 135 *A*.2d 483.[10]

 These guiding principles demonstrate that it is critical to identify the evidence that an aggrieved employee believes will support the CEPA recovery with care and precision. Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA.

 More to the point, trial courts must be precise in their communications with the jury and must ensure that the factual evidence could support a basis for a CEPA claim. When instructing juries, trial courts must be vigilant in identifying the essential complaint made by the employee in order that the jury will be able

---

[10] In considering the sufficiency of the proofs of causation, the Appellate Division referred to guidance from the United States Supreme Court to similar effect. *See Staub v. Proctor Hosp.*, —— *U.S.* ——, 131 *S.Ct.* 1186, 1190, 179 *L.Ed.*2d 144, 151 (2011) (explaining meaning of "cat's paw" theory, pursuant to which an employer is "liable for the animus of a supervisor who was not charged with making the ultimate employment decision"). We need not further address this theory, instead electing to rely on our existing case law for guidance of our courts.

to test it against the standards that the law imposes as a prerequisite to recovery. Applying all of these principles to the record before us, we agree with the Appellate Division's observation that the evidence on which plaintiff relies to support his CEPA claim is insufficient. We reach this conclusion for three reasons.

First, the anonymous letter, although it leveled a wide variety of allegations, made no reference to any conduct that related, even remotely, to credit cards or business lunches. Even the most searching investigation into the allegations in the letter would not have put defendant on notice that plaintiff was trying to blow the whistle about credit card fraud. Therefore, the CEPA claim rises or falls on the oral complaint that plaintiff asserts he made to DeCraine.

Second, that oral complaint was a single comment to DeCraine about employees in another division. Even articulated in a manner most indulgent to plaintiff, that comment was either about "improprieties on the . . . credit card usage[,]" or about employees who were "going out for liquid lunches and abusing the UPS credit card." Although there was much evidence adduced at trial through other employees concerning practices that, had plaintiff complained about them, might have been seen as a kind of fraud, there was no evidence offered that plaintiff witnessed it or complained about it. On the contrary, even at trial, his testimony remained vague and the sole employee whom he suggested was his source testified that he had neither told plaintiff about the use of credit cards nor had any reason to believe the practices were wrongful.

Third, plaintiff did not suggest in his communication with DeCraine, nor did he believe, that the employees about whom he complained were engaged in fraudulent conduct of any kind. Rather, we agree with the Appellate Division's apt observation that, to the extent that plaintiff simply complained about other employees who were drinking at lunch or taking long lunch breaks, it would not rise to the level of activity protected under CEPA. *See Roach, supra,* 164 *N.J.* at 613–14, 754 *A.2d* 544

(commenting that complaints about extended lunch breaks are not protected). Similarly, as in *Roach*, we do not suggest that, even if proven, a complaint about a minor violation of a company's internal policy on the use of company credit cards would be cognizable. *Id.* at 613, 754 *A.*2d 544 (noting that "minor infractions" that violate company policies are not "unlawful conduct as contemplated by CEPA"). Our review of the record convinces us that the evidence before the jury, even viewed in the light most favorable to plaintiff, is insufficient to support a recovery for plaintiff based on the fraud element of CEPA.

 Even were we to conclude that plaintiff offered enough evidence to sustain a CEPA recovery, we would nonetheless be constrained to reverse this aspect of the verdict because of the significant error in the jury charge. We first disagree with the reasoning of the appellate panel that defendant waived any objection to the sufficiency of the charge. In light of defendant's repeated objections to the charge in colloquy with the court during the charge conferences, we do not regard the failure to reiterate those objections formally after the court delivered the charge to the jury as amounting to waiver. *See Cavanaugh v. Skil Corp.*, 331 *N.J.Super.* 134, 157–58, 751 *A.*2d 564 (App.Div.1999) (finding no waiver of objection clearly stated by party who subsequently permitted charge to be given "to move the proceeding along"), *aff'd as modified,* 164 *N.J.* 1, 751 *A.*2d 518 (2000).

 Substantively, the charge was in error because it told the jury it could return a CEPA verdict based on complaints that "dealt with credit cards, dealt with meal practices[,] and other things." In the context of this trial, that description was erroneous for two reasons.

 First, in instructing the jury on a CEPA claim, it is incumbent upon the court to identify the protected activity precisely, that is, to articulate the complaint that plaintiff made that constitutes whistle-blowing. By using this broad and open-ended description in the jury charge, however, the trial court failed to

give an adequate explanation of the alleged wrongful activity that could support a verdict in plaintiff's favor on his CEPA claim.

Second, however, because of the proofs that were offered, this description failed to provide the jury with the appropriate focus as a matter of law. The CEPA claim should have been tested against what plaintiff knew and reasonably believed, not upon what actually was or was not happening, yet the vast majority of the testimony at trial about the subject of the credit cards and the lunches came from others and was untethered to any belief, reasonable or not, of plaintiff's. Because the "and other things" description in the charge was so broad and open-ended, it failed to accurately identify the protected activity, therefore being in error both as a matter of fact and of law. In the absence of complete and accurate guidance from the court in the jury instructions, we can have no confidence in the CEPA verdict, nor can we permit it to stand.

## VII.

Finally, we affirm the judgment of the Appellate Division affirming the trial court's rejection of plaintiff's implied contract claim. First, we do so because we are fully in accord with the trial court's substantive analysis of the claim. Second, we concur with the reasoning of the appellate panel that the only damages that could be recovered, if there were any merit to that claim, would be entirely co-extensive with the verdict plaintiff has already received.

In light of our conclusions that the LAD verdict on liability and damages will be reinstated and that plaintiff's emotional distress claim will be remanded for further proceedings, plaintiff will have the opportunity to achieve complete relief. Any further recovery on any alternate theory necessarily would be duplicative.

## VIII.

The judgment of the Appellate Division is reversed to the extent that it dismissed the LAD claim and to the extent that it affirmed

the CEPA verdict. The judgment of the Appellate Division is affirmed to the extent that it reversed and remanded the damage award for emotional distress and to the extent that it affirmed the dismissal of the claim based on breach of implied contract. The LAD verdict on liability and economic damages is reinstated, the LAD-based claim for emotional distress damages is remanded, and the CEPA verdict on liability is vacated.

*For Affirmance in part/reversal in part/remandment*—Chief Justice RABNER, Justices HOENS and PATTERSON, and Judges PARRILLO (temporarily assigned) and FUENTES (temporarily assigned)—5.

*Opposed*—None.

*Not participating*—Justices LaVECCHIA and ALBIN, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned).