**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3200-19

J.R.,

     Plaintiff-Appellant,

v.

CITY OF JERSEY CITY,

     Defendant-Respondent.

_____

Submitted April 12, 2021 – Decided June 21, 2021

Before Judges Sabatino, Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4920-17.

Caruso Smith Picini, PC, attorneys for appellant (Ben Weathers, on the brief).

City of Jersey City Department of Law, attorneys for respondent (Chaunelle C. Robinson, on the brief).

PER CURIAM

Plaintiff J.R.[1] is a former police officer employed by the Jersey City Police Department (JCPD). He was deemed unfit for duty after undergoing numerous psychological evaluations and eventually terminated. Thereafter, plaintiff filed a complaint against the City of Jersey City (defendant) alleging various violations of the Americans with Disabilities Act (ADA),[2] the New Jersey Law Against Discrimination (LAD),[3] and the New Jersey Civil Rights Act (CRA).[4] After the conclusion of discovery, defendant moved for and was granted summary judgment on all claims. We affirm.

I.

We derive our facts from the summary judgment record. Plaintiff is a Hispanic male who began his career with the JCPD in July 2005. His complaint contained a myriad of allegations which we need not repeat in detail but will summarize to enable a discussion of the applicable law.

---

[1] We use initials to preserve the confidentiality of court records concerning domestic violence. R. 1:38-3(d)(9).

[2] 42 U.S.C. § 12101 to -12213. Plaintiff dismissed his ADA claims prior to the summary judgment motion hearing.

[3] N.J.S.A. 10:5-1 to -50.

[4] N.J.S.A. 10:6-1 to -2.

Plaintiff alleges that after he questioned the legality of a police detail at a construction site in 2007, he was branded as a "rat" and his supervisors retaliated against him and his peers at work distrusted him.

During his employment, plaintiff gained 150 to 160 pounds, which he attributed to "[w]orking midnights, not sleeping well," and a "poor diet . . . ." He stated he was harassed and ridiculed about his weight by fellow officers and his superiors. Therefore, he complained to his captain about the hostile work environment. According to plaintiff, despite him undergoing successful weight reduction surgery in 2013, the harassment continued.

In 2008, plaintiff requested and was granted a transfer to a different district of Jersey City. His new supervisors described him as "a marginal performer who does as little [as] possible to get by under the radar" with "atrocious" report writing skills. The supervisors also stated that numerous officers would not work with plaintiff because he was a "malingerer" who attempts to get out of any required police action and does not help others with their work.

In October 2009, plaintiff was disciplined for failing to file an investigation report as ordered by a superior, leaving his assigned post without permission, utilizing a department vehicle without permission, and becoming

3

belligerent and disrespectful when he was directed to file a report regarding his failure to file the investigation report. Plaintiff waived his right to a hearing and entered into a settlement agreement. He was found guilty of neglect of duty, insubordination, failing to patrol his post, and failing to obey orders. He received a penalty of a suspension of five working days.

In February 2010, plaintiff was involved in a domestic violence dispute with his wife, following which his wife was granted a temporary restraining order (TRO). Thereafter, plaintiff's service weapon was confiscated and he was placed on modified duty. The following month, plaintiff's wife dismissed the TRO and consented to the return of plaintiff's service weapon.

The JCPD requested plaintiff undergo a psychological examination to assess his fitness for duty. After an interview and examination, Dr. Guillermo Gallegos, Ph.D., found that plaintiff had "limited empathy for others," was "loyal only to himself", was "not a team player", and "possess[ed] little tolerance for frustration or disappointment." Dr. Gallegos concluded that plaintiff was "in dire need of professional help . . . ." Because he was a potential danger to himself and others, the psychologist opined that plaintiff should not possess a firearm and he was not fit for duty.

After undergoing psychological treatment for several months, plaintiff was reevaluated and cleared to return to duty in September 2010.

A year later, plaintiff was involved in another domestic violence dispute with his wife.[5] He alleged his wife had struck him and he was granted a TRO. However, after his wife filed assault charges against him and obtained a TRO, plaintiff was placed on modified duty and his service weapon was confiscated.[6]

The JCPD again referred plaintiff for a fitness for duty examination. On March 22, 2012, Dr. Matthew Guller, J.D., Ph.D., examined and interviewed plaintiff. The doctor noted plaintiff intended to begin counselling with Dr. Paul Hriso, M.D. Although Dr. Guller found plaintiff fit for duty he noted that plaintiff's "performance on the job is also of concern." He recommended that JCPD "maintain some form of monitoring of [plaintiff]."

As noted by Dr. Guller, plaintiff was in the midst of several internal affairs investigations. Earlier in March, disciplinary charges were lodged against him, including failure to report for duty, lying to a superior about his shift hours, leaving an assignment, neglect of duty, and failure to maintain a working

---

[5] At the time, plaintiff and his wife were estranged and involved in divorce proceedings.

[6] Plaintiff and his wife agreed to mutually dismiss their TROs in October 2011. The criminal charges were dismissed in January 2012.

A-3200-19

knowledge of orders and policies. Plaintiff had not reported to work on time and left work early without permission for over seven months. Plaintiff admitted he had not completed his required eight-hour shift for the past two years.

Plaintiff also violated JCPD's Policy on Social Media and Social Networking Websites. The policy, issued in March 2012, prohibits JCPD personnel from "posting any images or video that may reflect negatively on the Department." The policy states that officers are not to engage in social media while on duty and prohibits personnel from posting images or video of the following: officers in uniform; undercover officers; the City Seal; the JCPD name; badges; logos; patches; patrol vehicles; weapons; contraband; and tactical instruments.

In April 2015, Sergeant Marc Gigante wrote a letter to the Internal Affairs Unit (IAU) Commander, informing him that a woman filed a complaint reporting plaintiff's inappropriate social media activity and what she perceived as threats against her family in a social media message received from him. Gigante found plaintiff had not made specific threats against the complainant or her family.

A-3200-19

However, while investigating the complaint, Gigante documented fifty-two violations of JCPD's social media policy on plaintiff's Instagram account.[7] Gigante stated plaintiff had posted pictures of himself and other officers in uniform on his Instagram account during his work shifts and in the course of his duties. In many of the photos, plaintiff was wearing his uniform; in some pictures he was brandishing weapons or other tactical instruments. Other photos depicted JCPD vehicles and facilities.

The content of the Instagram posts caused Gigante concern because the text revealed plaintiff's "aggression toward the general public . . . ." Gigante found the content of the posts was "not the thinking of a mentally stable police officer." One of the most egregious social media posts showed plaintiff in uniform prominently displaying his middle finger with a caption that contained racist and derogatory language. Plaintiff also referred to himself as "a dangerous beast," and a predator such as a wolf or lion, and implied that normal citizens were "sheep that he [would] stalk and prey on."

---

[7] At the time plaintiff had twenty-four thousand followers on his Instagram account.

A-3200-19

Gigante wrote that "[plaintiff] paints [JCPD] in a very negative light by posting his personal beliefs and using extremely inappropriate language while wearing his uniform and appearing in [JCPD] vehicles and facilities."

Disciplinary charges were again brought against plaintiff for violating JCPD's social media policy, for conduct unbecoming an officer, and for failure to obey laws, regulations, and orders. Gigante recommended that plaintiff undergo an evaluation to determine if he was psychologically fit to remain a police officer. Plaintiff was placed on modified duty and required to surrender his service and personal weapons.

On April 24, 2015, Lewis Z. Schlosser, Ph.D., performed a psychological examination and determined plaintiff was not fit for duty. Dr. Schlosser administered eight psychological tests, conducted an in-depth diagnostic interview, and reviewed plaintiff's prior evaluations, the internal affairs file, disciplinary history, and numerous social media posts.

Dr. Schlosser concluded that plaintiff demonstrated "chronic and pervasive patterns of poor integrity, poor social competence and teamwork, impulse dyscontrol, and poor judgment; these are serious psychological liabilities in a police officer." He found plaintiff was not credible because he failed to disclose truthful information about his disciplinary history. In addition,

the doctor stated that plaintiff "appears to be unable and/or unwilling to comprehend the seriousness of his actions that resulted in him being referred for a fitness for duty evaluation."

Based on psychological testing, background data from JCPD, and plaintiff's presentation during the evaluation, Dr. Schlosser determined that plaintiff possessed traits associated with Histrionic Personality Disorder with Narcissistic personality features. He further opined that plaintiff's "life history demonstrated that mental health treatment and disciplinary actions have been unsuccessful at preventing negative incidents from recurring." He stated that plaintiff's "psychological condition or impairment" would "likely . . . interfere with his ability to safely and effectively function as a police officer" and concluded that he was "[n]ot fit for duty with little chance of recovery." He concluded by stating that "[plaintiff] suffers a degree of mental illness or disability in his job-related conduct that is of sufficient magnitude so that the undersigned finds the subject impaired and unlikely to be restored to duty in a reasonable period of time."

On April 28, 2015, plaintiff was suspended without pay. Due to an irregularity in the suspension procedure, the union attorney requested plaintiff be placed on modified duty. Plaintiff was eventually placed on paid sick leave

and awarded back pay for the time he was suspended without pay. Plaintiff was paid his full salary until his termination in July 2016.

As stated above, plaintiff came under the care of Dr. Hriso in April 2015. He was diagnosed with depression and placed on medication. Plaintiff saw Dr. Hriso approximately once a month between April 2015 and June 2016. In October 2015, Dr. Hriso sent a letter to JCPD characterizing plaintiff's prognosis as "[f]air to poor." He advised that plaintiff was "currently unable to work" and should be placed on sick leave indefinitely.

Thereafter, on November 12, 2015, JCPD referred plaintiff to Dr. Guller who again evaluated plaintiff's fitness for duty. Dr. Guller administered seven psychological tests, performed an in-depth diagnostic interview, and reviewed the prior fitness for duty evaluations and plaintiff's social media activity. Dr. Guller found plaintiff continued to "reflect poor judgment, impulsivity and disregard for how his actions might be seen by others as intimidating and problematic for the Department as a whole." He further opined that "[t]hese tendencies were likely to persist, given [plaintiff's] apparent lack of insight, continuance of problematic behaviors despite treatment," and the findings of longstanding problematic personality traits that pose a "risk to the community and officer safety."

10

Dr. Guller concluded plaintiff was "[n]ot fit for duty with little chance of recovery. [Plaintiff] suffers a degree of mental illness or disability in his job-related conduct that is of sufficient magnitude so that the undersigned finds the subject impaired and unlikely to be restored to duty in a reasonable period of time."

On February 9, 2016, Dr. Hriso issued a report disagreeing with all of Dr. Guller's conclusions. Dr. Hriso stated plaintiff was no longer on any medication and was fully fit to return to work. He advised that plaintiff told him his job performance was never an issue. The report does not state that Dr. Hriso reviewed plaintiff's personnel file or his disciplinary history.

During his March 4, 2020 deposition, Dr. Hriso admitted he did not see all of plaintiff's social media posts, including the post where plaintiff used derogatory racial language and displayed his middle finger. Dr. Hriso also conceded he did not conduct any personality disorder or depression tests. He further advised he relied exclusively on plaintiff's personal statements concerning his history with JCPD.

On March 15, 2016, Anthony Jenkins of New Pathway Counseling Services examined plaintiff and concluded he was fit for duty. Jenkins' report does not include any information about plaintiff's disciplinary history, the social

11

media posts, or his prior fitness for duty evaluations. Jenkins admitted at his deposition that he is a substance abuse counselor, that he does not diagnose mental health disorders, and that he does not perform fitness for duty evaluations. He conceded he did not review plaintiff's personnel file, his disciplinary history, or his prior fitness for duty evaluations. Instead, Jenkins relied exclusively on the information plaintiff gave him during the evaluation.

Thereafter, plaintiff requested JCPD to reinstate him. In response, JCPD referred him for another fitness for duty evaluation. To counter plaintiff's assertions that the prior evaluators were not objective, JCPD referred him to a different facility and evaluator. This evaluation was conducted on April 28, 2016 by Betty McLendon, Psy.D.

In her May 24, 2016 report, Dr. McLendon diagnosed plaintiff with Narcissistic Personality Disorder with Obsessive Compulsive, Histrionic, and Paranoid features and traits. She found that plaintiff's "attempts to justify his actions clearly denotes poor judgment." She also commented that "[t]he extent to which he engaged in these [social media] postings and the content again points to his poor judgment and the quality of his thought content suggest grandiose ideals that were at times aggressive and out of touch with reality . . . ." Dr. McLendon found plaintiff was not fit for duty.

A-3200-19

On June 1, 2016, defendant sent plaintiff a letter advising that his one year of allotted paid sick leave would expire on July 1, 2016. The letter indicated plaintiff would be terminated from his employment unless he: (1) returned to work, requesting a reasonable accommodation if needed; (2) used compensatory or vacation time; (3) took an unpaid leave of absence; or (4) retired.

On June 17, 2016, Dr. Hriso issued a report critiquing Dr. McLendon's findings. He stated that plaintiff did not have a personality disorder and Dr. McLendon's assessment to the contrary was "completely unsubstantiated."

On June 23, 2016, defendant's FMLA/ADA coordinator, Cameron Day, emailed defendant's Medical Unit Commander, advising he had been in contact with Dr. McLendon and plaintiff regarding other jobs plaintiff might perform. Plaintiff told Day he was not requesting an ADA accommodation because nothing was physically or mentally wrong with him. Plaintiff stated he was only interested in returning to his job as a police officer.

Defendant reminded plaintiff on June 29, 2016 that he could use his accrued vacation or compensatory time to remain on the payroll. That same day, plaintiff wrote a letter to the Chief of Police requesting reinstatement to full active duty as a Jersey City police officer.

On July 11, 2016, JCPD informed plaintiff his paid sick leave had run out on July 1. Because he had declined an accommodation and had not opted to use his accrued compensatory or vacation time, the letter advised plaintiff he was placed on unpaid leave effective July 1, 2016. Plaintiff was also offered and rejected a disability pension.

On July 19, 2016, defendant wrote to plaintiff confirming the ADA interactive process was terminated on June 23, 2016 because plaintiff refused an ADA accommodation. JCPD terminated plaintiff's employment on July 22, 2016.

## II.

Plaintiff filed his complaint in the Law Division in December 2017. Two years later, in December 2019, defendant filed a motion to compel the deposition of Dr. Hriso. The motion was granted and Dr. Hriso was ordered to comply with the subpoena issued for his deposition. When Dr. Hriso failed to comply with the order, defendant moved to bar Dr. Hriso's reports and testimony. The motion was granted on February 14, 2020. The order stated, "should [p]laintiff make Dr. Hriso available for deposition by March 6, 2020, [p]laintiff may file a motion for reconsideration of this Order."

Defendant moved for summary judgment on February 14, 2020. Two weeks later, on March 2, plaintiff moved for reconsideration of the order barring Dr. Hriso's reports and testimony. Plaintiff advised counsel and Dr. Hriso had agreed to a deposition date of March 4. The reconsideration motion was calendared after the summary judgment return date.

Although Dr. Hriso appeared for his deposition on March 4, 2020, he informed defendant that he was only available for two hours. Defendant was unable to complete Dr. Hriso's deposition in the short timeframe.

### III.

In a comprehensive written decision issued March 13, 2020, the trial court granted defendant's motion for summary judgment. In light of that ruling, the court denied plaintiff's motion for reconsideration regarding Dr. Hriso's reports and testimony as moot on March 27, 2020.

In his summary judgment decision, the motion judge considered each of plaintiff's stated causes of action under the LAD. The court first addressed plaintiff's assertion that he was discriminated against because of his disability of being overweight. The trial court found plaintiff could not establish any connection between his weight and his termination several years after undergoing weight loss surgery. Moreover, even if plaintiff could demonstrate

a prima facie case, the "evidence [was] overwhelming that [p]laintiff was not fit for active duty as a police officer." The judge relied on plaintiff's psychological evaluations, disciplinary history, domestic violence incidents, and social media posts in violation of defendant's policies to support his conclusions.

The court also found plaintiff could not demonstrate discriminatory intent. The judge noted defendant attempted to resolve the issues by sending plaintiff to several different psychological facilities for evaluations and providing him with the opportunity to demonstrate his fitness for duty. In addition, Day contacted plaintiff advising him there were other available positions and defendant offered him a disability pension. Plaintiff responded that he only wanted employment as a police officer and did not want an accommodation.

The court also rejected plaintiff's claims of race-based treatment in violation of the LAD. Plaintiff asserted he was treated differently than white colleagues in JCPD who also posted "aggressive and vulgar" images on social media. The judge noted that plaintiff had to prove a discriminatory motive to satisfy his allegation of racially disparate treatment. He also had to show a direct causal connection between the hostility displayed towards members of his class and his termination.

The trial court also found plaintiff failed to present any evidence that defendant's actions regarding his employment were motivated by race. The judge noted plaintiff's concession that he had not actually seen any posts by other police officers on social media. The court concluded plaintiff had not established a direct causal connection between his race and his termination as a police officer.

Plaintiff also alleged that defendant retaliated against him for objecting to the findings from the fitness for duty evaluations. The motion judge again found plaintiff had not established a causal link between the protected activity and his termination. The court noted plaintiff was removed from his employment due to concerns about his mental health and the safety of the public. The judge stated: "Plaintiff was investigated for conduct online which raised a question as to his mental health and consequently, a question as to whether he was fit for duty."

Lastly, the motion judge considered plaintiff's claims under the CRA. Plaintiff contended defendant retaliated against him because he was perceived as a potential whistleblower who would report allegations of police misconduct. The court found "[i]t [was] unclear for what police misconduct [p]laintiff

17

believes he may be labeled a 'potential whistleblower.'" The court further found plaintiff had not presented any evidence to support this claim.

IV.

We review the grant of summary judgment de novo, applying the same legal standard as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citation omitted). Therefore, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (citations omitted). We review issues of law de novo and accord no deference

to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

On appeal, plaintiff contends the trial court erred in granting summary judgment because he "raised disputed material questions of fact as to the correctness of his termination, the issues regarding his work environment and fitness for duty and whether appropriate efforts were made to accommodate him as required under [the] LAD." In addition, plaintiff argues the court erred in granting summary judgment on his CRA claims.

A.

We begin by addressing plaintiff's disability discrimination claim. Plaintiff contends defendant discriminated against him because of a disability by terminating his employment and defendant failed to reasonably accommodate his disability. Plaintiff states the trial court mistakenly considered plaintiff's alleged disability as his weight. He asserts his disability instead is the perception that he is unfit for duty.

The LAD forbids "any unlawful discrimination against any person because such person is or has been at any time disabled or unlawful employment practices against any person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A.

10:5-4.1.  To analyze an alleged violation of the statute, New Jersey has adopted the three-step burden shifting test articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Anderson v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982).

Under McDonnell Douglas, the plaintiff's ability to establish "a prima facie case gives rise to a presumption of discrimination."  Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002) (citing Anderson, 89 N.J. at 493).  Once the plaintiff establishes a prima facie case, "the burden . . . going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  Ibid.  Thereafter, the "burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination."  Ibid.

When a plaintiff alleges he was terminated based on a disability, he must establish:

> (1) a disability or the employer's perception that the employee was disabled; (2) the employee remains qualified to perform the essential functions of the job and was performing at a level that met the employer's expectations; (3) an adverse employment action because of the disability or perceived disability; and (4) the employer thereafter sought a similarly qualified individual.

[Wild v. Carriage Funeral Holdings, Inc., 458 N.J. Super. 416, 429 (App. Div. 2019) (citing Grande v. St. Claire's Health Sys, 230 N.J. 1, 17-18 (2017)).]

Here, plaintiff cannot establish the second prong of the test.  He was not performing the essential functions of a police officer and was clearly not performing his duties at a level meeting defendant's expectations.  In 2009, plaintiff was reprimanded for failing to file an investigation report as ordered by a superior, leaving his assigned post without permission, utilizing a department vehicle without permission, and becoming belligerent and disrespectful when he was directed to file a report on his failure to file the investigation report.  In 2012, plaintiff was charged with failing to report for duty, leaving his assignment without authorization, and lying about his work hours.

From March 2014 to April 2015, plaintiff was charged with neglect of duty for failure to properly handle a call about a suicidal male, conduct unbecoming an officer for using profanity to superior officers, failure to investigate a domestic violence dispute, and violations of JCPD's social media policy.

In 2015, an IAU investigation uncovered fifty-two violations of defendant's social media policy, including pictures of plaintiff while in JCPD uniform, brandishing weapons, and posting photos of JCPD vehicles and

facilities. The captions of the posts were especially troubling and some featured derogatory and racist language. Thereafter, plaintiff was placed on modified duty pending the outcome of a psychological exam to determine his fitness for duty.

From April 2015 to April 2016, plaintiff's fitness for duty was evaluated on three separate occasions by three different doctors. Plaintiff's diagnosed conditions of Narcissistic Personality Disorder and Histrionic Personality Disorder caused all three mental health professionals to conclude he was not fit for duty. One professional commented that plaintiff's illness was "of sufficient magnitude so that the undersigned finds the subject impaired and unlikely to be restored to duty in a reasonable period of time." Although a substance abuse counselor opined plaintiff was fit for duty, he testified that he neither diagnosed mental health disorders nor performed fitness for duty evaluations.

The record does not support plaintiff's claim that defendant discriminated against him because of a perceived disability. To the contrary, defendant accorded plaintiff a year of paid sick leave to permit him to address his psychological issues. Even if plaintiff could establish a prima facie case, the trial court found defendant presented a legitimate non-discriminatory reason for the termination – numerous expert psychological evaluations concluded plaintiff

22

was not fit to perform the essential functions of his job. We discern no reason to disturb the court's conclusion that defendant demonstrated a reasonable basis for plaintiff's termination, and that no genuine issues of material fact existed concerning those grounds for termination.

B.

We are also satisfied that plaintiff did not demonstrate defendant failed to accommodate his disability. "Although the LAD . . . does not specifically address failure to accommodate, 'our courts have uniformly held that the [LAD] nevertheless requires an employer to reasonably accommodate an employee's handicap.'" Royster v. N.J. State Police, 227 N.J. 482, 499 (2017) (citing Potente v. Cnty. of Hudson, 187 N.J. 103, 110 (2006)) (quoting Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 396 (App. Div. 2002)).

To determine what accommodation is necessary, the employer must initiate an "interactive process" with the employee to "identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations . . . ." Tynan, 351 N.J. Super. at 400. To sustain a claim that an employer failed to participate in the interactive process, an employee must demonstrate:

> (1) the employer knew about the employee's disability;
> (2) the employee requested accommodations or

23

assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

[Id. at 400-01.]

Here, plaintiff never requested an accommodation. At all times, he only asked to be reinstated as a police officer. In addition, plaintiff's claim that defendant failed to participate in the interactive process lacks merit because defendant contacted plaintiff to discuss whether there was a reasonable accommodation. Plaintiff rejected the offer and responded he did not want any accommodations.

As discussed above, defendant contacted plaintiff on June 1, 2016, offering several options plaintiff might pursue once his allotted paid sick leave expired. The letter informed plaintiff he should contact Day, the FMLA/ADA coordinator, to "identify possible reasonable accommodations . . . to help [plaintiff] perform the essential functions of a police officer . . . ."

In an email dated June 23, 2016, Day advised he had spoken to Dr. McLendon, who informed him that although plaintiff "does not have the capacity to work in a sensitive public safety position or any positions he would be required to wield a weapon, he is capable of performing other job duties."

Day also said he had spoken to plaintiff about an ADA accommodation and that plaintiff responded he was "not requesting an ADA accommodation, because nothing is physically or mentally wrong with him." Plaintiff informed Day that the "only position he [was] interested in returning to" was police officer.

On July 19, Day wrote a letter to plaintiff memorializing plaintiff's refusal to accept an ADA accommodation and the termination of the interactive process. Plaintiff conceded during his deposition that he was offered a forty percent disability pension; however, he refused to take it because "that would potentially damage my litigation and trying to again be a police officer."

The record supports the trial court's finding that defendant clearly attempted to engage in the interactive process with plaintiff. Defendant offered plaintiff several options in lieu of termination, but plaintiff was only interested in being reinstated as a police officer. Plaintiff refused a reasonable accommodation and unilaterally ended the interactive process. Therefore, he cannot establish a failure to accommodate claim.

C.

Plaintiff also asserts the trial court erred in granting summary judgment on his claim of disparate treatment in violation of the LAD. He contends that

"many of his white fellow police officers posted aggressive and vulgar images on social media," however he was the only officer to be terminated.

The LAD prohibits discrimination because of race, color, national origin, ancestry, age, sex, or nationality. N.J.S.A. 10:5-12. Disparate treatment can be shown if an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." Gerety v. Atlantic City Hilton Casino Resort, 184 N.J. 391, 398 (2005) (citation omitted).

A discrimination claim based on disparate treatment is also evaluated under the McDonnell-Douglas framework discussed above. 411 U.S. at 802. Plaintiff must demonstrate a prima facie case and prove a "discriminatory motive[,] . . . although it can in some situations be inferred from the mere fact of differences in treatment." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81 (1978).

To prove a prima facie case based upon discriminatory discipline, the plaintiff must show: (1) he was a member of a protected group; (2) he was discharged for violating a company policy; (3) non-minority employees were not held to compliance with the company policy; and (4) the minority employee was disciplined in conformity with company policy. Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 304-05 (App. Div. 2000) (citing Jackson v.

Georgia-Pac. Corp., 296 N.J. Super. 1, 21 (App. Div. 1996)). "Especially relevant to such a showing would be evidence that white employees involved in acts . . . of comparable seriousness . . . were nevertheless retained." Id. at 305 (quoting McDonnell Douglas, 411 U.S. at 804) (alterations in original).

Plaintiff contends he received disparate treatment because he violated JCPD's social media policy and was terminated, while other white officers posted objectionable material and did not receive similar discipline. Plaintiff supports his claim with screenshots of various JCPD police officers' social media posts which plaintiff contends violate the JCPD social media policy. However, this isolated evidence alone cannot support plaintiff's claim that his termination was motivated by race.

JCPD became aware of plaintiff's social media accounts when a civilian complained about his posts and felt she and her family were threatened by their content. Although the threats were determined to be unfounded, the IAU officer reviewing the social media accounts found disciplinary charges were warranted based on the derogatory and disturbing nature of the posts. The IAU also determined the content of the posts warranted plaintiff undergoing mental health examinations to determine his fitness for duty.

A-3200-19

Plaintiff has not presented any evidence to support his assertion that his race was a factor which resulted in his termination. As discussed above, a myriad of incidents arising out of plaintiff's actions on and off the job led to the fitness for duty evaluations that resulted in his justified removal.

D.

Plaintiff also alleges the court erred in granting defendant summary judgment on his retaliation claim. In his complaint, he alleged defendant retaliated against him by "(1) fail[ing] to participate in the interactive process/failure to accommodate his perceived disability; (2) subjecting him to retaliatory disciplinary actions and punishment; (3) terminating his employment; and (4) filing false and misleading information to the Unemployment Board to delay his unemployment benefits."

To prove a claim for retaliation under the LAD, plaintiff must prove he "'engaged in a protected activity known to the [employer,]' [he] was 'subjected to an adverse employment decision[,]' and there is a causal link between the protected activity and the adverse employment action." Battaglia v. United Parcel Service, Inc., 214 N.J. 518, 547 (2013) (quoting Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996) (alterations in original)).

It is unclear what protected activity plaintiff references. In his complaint, plaintiff alleged defendant retaliated after plaintiff complained about his fitness for duty and suspension. However, in his appellate brief, plaintiff states the protected activity is that "he was employed by . . . [d]efendant, that he was performing his duties in a proper manner and that his social media activities were appropriate and no different than any other employee of [d]efendant." Plaintiff fails to explain how any of these activities are protected under the LAD.

Even if these are protected activities, plaintiff fails to show or explain how these activities are causally linked to defendant's decision to terminate his employment. As explained above, defendant presented a legitimate non-discriminatory reason for terminating plaintiff.

E.

We turn next to plaintiff's contention that the trial court erred in granting summary judgment on his CRA claims. Specifically, plaintiff asserts that defendant "has a de facto policy, practice or custom of discouraging, threatening and retaliating against police officers who report police misconduct and corruption, commonly referred to [as] a 'code of silence.'" Plaintiff alleges that pursuant to this policy, defendant retaliated against him because he was perceived as a "whistleblower" and reported allegations of police misconduct.

29

Plaintiff also asserts that defendant retaliated against him for "posting personal pictures without any relation to [JCPD] on his private social media accounts" in violation of his right to free speech.

The CRA provides a private cause of action for an individual subjected to a deprivation of rights. N.J.S.A 10:6-2(c). New Jersey courts "look[] to federal jurisprudence construing 42 U.S.C. § 1983 to formulate a workable standard for identifying a substantive right under the [CRA]." Harz v. Borough of Spring Lake, 234 N.J. 317, 330 (2018).

We discern no merit to plaintiff's whistleblower claim because he has not demonstrated defendant had a de facto policy, practice or custom of discouraging, threatening, and retaliating against police officers who reported police misconduct.

A municipality "may not be sued under the [CRA] for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmaker or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under the [CRA]." Ibid. See Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544,

565 (2010) (stating that a municipality can be held liable for acts committed by one of its employees pursuant to a governmental policy or custom that violates the Constitution). A municipality may be liable for the action of an official who "possesses final authority to establish municipal policy with respect to the action ordered." Besler, 201 N.J. at 565 (quoting Stomel v. City of Camden, 192 N.J. 137, 146 (2007)).

Plaintiff has not presented competent evidence to support his claim that defendant had a de facto policy of retaliation. He alleges in his complaint that he complained about the legality of a police detail at a construction site in 2007. He alleged that after making this complaint, "every supervisor retaliated against him and his fellow police officers distrusted him." However, he did not produce any evidence to support these allegations.

In addition, plaintiff has not established any causal relationship between his complaint concerning the police detail and his termination more than nine years later. Not only did plaintiff fail to present any evidence establishing defendant maintained a de facto policy to keep police officers from reporting police misconduct, he did not name any individual who possessed the authority to establish the custom or practice of retaliation.

Plaintiff's First Amendment claim also fails because defendant has a right to restrict plaintiff's speech when the speech undermines its ability to run an effective and efficient police department.

"[T]o plead a claim of retaliation under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Indep. Twp., 463 F. 3d 285, 296 (3d Cir. 2006) (quoting Mitchell v. Horn, 318 F. 3d 523, 530 (3d Cir. 2003)).

When a public employee sues a government employer under the First Amendment, the "test is whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.'" Karins v. City of Atlantic City, 152 N.J. 532, 549 (1998) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). If the public interest prong is satisfied, the court must balance the employee's interest in free speech against the "government's interest in the effective and efficient fulfillment of its responsibilities to the public." Ibid. (quoting Connick, 461 U.S. at 150). "Racist speech or conduct . . . is not purely private [speech] when made in connection with the performance of public service . . . ." Id. at 563. "When someone who is paid a salary so that [he] will

contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him]."  Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 386-87 (2011).  Therefore, "where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate."  Waters v. Churchill, 511 U.S. 661, 675 (1994).

Plaintiff was a JCPD police officer who posted numerous photos on social media in violation of JCPD's social media policy.  Many of these photos were posted while plaintiff was on duty and in JCPD uniform.  Some of the captions that accompanied these photos included racist, derogatory, and threatening language.  Plaintiff exercised an extreme lack of judgment in publishing these photos and painted the JCPD in a bad light.  Additionally, his actions hindered JCPD's ability to run a credible and effective police department.  Because plaintiff's speech cannot be considered protected speech, defendant's decision to discipline him based on the numerous violations of the social media policy did not violate his First Amendment rights.

F.

33

Plaintiff contends the trial court erred when it decided the motion for summary judgment before it considered the merits of the motion for reconsideration concerning discovery issues. We see no abuse of discretion.

In his decision granting summary judgment, the trial judge acknowledged Dr. Hriso's opinion that plaintiff was fit for duty. He also noted Dr. Hriso's reports were barred because he had failed to comply with a court order. Even when Dr. Hriso appeared for his deposition, he left after two hours, leaving defendant unable to complete its questioning. It is clear from the judge's analysis of the claims and the application of the law that any further testimony from Dr. Hriso would not have made a difference in the judge's ultimate conclusions.

As the court stated, even if plaintiff were able to prove his prima facie case, defendant had shown substantial non-discriminatory proof to support its decision to terminate plaintiff. Furthermore, Dr. Hriso admitted at his deposition that he did not request plaintiff to do any psychological testing as conducted by the other doctors, he did not look at all of plaintiff's social media posts, and he based his evaluation solely on plaintiff's self-described personal history.

34

There was no abuse of discretion in determining the summary judgment motion before considering the motion for reconsideration.

To the extent we have not commented on them specifically, all other points plaintiff raises on appeal lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3200-19