**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4038-23
               A-4039-23
               A-4041-23

CARLOS FORTY,

     Plaintiff-Appellant,

v.

INSPIRA HEALTH NETWORK,
BARBARA CONCIELLO, and
DENISE LAMBRECHT, in
their individual and corporate
capacities, and as aiders and
abettors,

     Defendants-Respondents.

_____

NANCY KARNUK,

     Plaintiff-Appellant,

v.

INSPIRA HEALTH NETWORK,
BARBARA CONCIELLO, and
DENISE LAMBRECHT, in
their individual and corporate
capacities, and as aiders and

abettors,

       Defendants-Respondents.

_____

RACHEL JENKINS,

       Plaintiff-Appellant,

v.

INSPIRA HEALTH NETWORK,
BARBARA CONCIELLO, and
DENISE LAMBRECHT, in
their individual and corporate
capacities, and as aiders and
abettors,

       Defendants-Respondents.

_____

> Argued March 26, 2025 – Decided June 17, 2025
>
> Before Judges DeAlmeida and Puglisi.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket Nos. L-0627-21, L-0628-21 and L-0629-21.
>
> Michael K. Fortunato argued the cause for appellants Carlos Forty in A-4038-23, Nancy Karnuk in A-4039-23, and Rachel Jenkins in A-4041-23 (Brandon J. Broderick, LLC, attorneys; Michael K. Fortunato, of counsel and on the briefs).
>
> Michael J. Miles argued the cause for respondents (Brown & Connery, LLP, attorneys; Michael J. Miles,

2

of counsel and on the briefs; James P. Clancy, on the briefs).

PER CURIAM

In these matters, calendared back-to-back and consolidated for purposes of this opinion, plaintiffs Carlos Forty, Nancy Karnuk, and Rachel Jenkins appeal from July 16, 2024 Law Division orders granting the summary judgment dismissal of their complaints against defendants Inspira Health Network (Inspira), Barbara Conicello,[1] and Denise Lambrecht in these matters alleging retaliatory termination and unlawful retaliation under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.  We affirm.

I.

We derive the following facts from the summary judgment record. Inspira, a non-profit organization, operates several hospitals in southern New Jersey.  Conicello is the Director of Nursing Operations and Lambrecht is the Director of Labor Relations at Inspira.  Lambrecht also serves as the Human Resources (HR) Business Partner for Inspira's corporate department.

Forty began working at Inspira in 2005 as a security guard.  He later accepted a position as a staffing coordinator.  Karnuk began working at Inspira

---

[1]  Conicello's name is misspelled in the complaints.

in 2006 as a staffing coordinator. Jenkins began working at Inspira in 2010 as a transporter. She took a position as a staffing coordinator in August 2019. Forty, Karnuk, and Jenkins reported to Conicello in their positions as staffing coordinators. There were two other staffing coordinators in their unit.

As staffing coordinators, plaintiffs were responsible for a variety of tasks, including timekeeping and payroll. They had access to Kronos, Inspira's timekeeping and payroll software system, and were responsible for finalizing employees' Kronos time cards prior to payroll closing each pay period. Payroll closed at approximately 11:00 a.m. every other Monday.

Conicello was responsible for reviewing the staffing coordinators' time cards for missed entries and accurate paid time off (PTO) prior to payroll closing each pay period. Conicello typically reviewed her staffing coordinators' time cards on Sunday evenings prior to the Monday morning closings. While staffing coordinators could not make alterations to their own time cards, they could edit entries on time cards for other employees, including other staffing coordinators.

The staffing coordinators were the gatekeepers of personal protective equipment, a stressful position during the COVID-19 pandemic. Unlike other administrative employees, staffing coordinators could not work from home during the pandemic. Morale at the staffing coordinator office began to wane

4

during the pandemic as employees became increasingly nervous about spending extra time at the hospital.

Conicello described the staffing coordinators' office as a "very stressful environment," the intensity of which was amplified during the COVID-19 pandemic. Several witnesses described Conicello's increasing anxiety during the pandemic. Tyree Ruhl, a staffing coordinator supervised by Conicello, testified as the pandemic wore on, Conicello grew "angry" at work. Plaintiffs testified Conicello "belittled" and "degraded" them and her management style was not professional. Jenkins described Conicello as "ready to fight at any minute." Plaintiffs frequently witnessed Conicello screaming, cursing, and slamming overhead locker doors when she was angry.

According to Lambrecht, Forty was a difficult employee who made petty gripes about his colleagues, supervisors, managers, and the hospital more broadly. Conicello described Forty as someone who always thought he knew better than others and constantly complained about Inspira management. He often bickered with Karnuk and boasted about his workplace accomplishments. Forty frequently called his fellow staffing coordinators lazy and claimed to be working harder and completing more tasks than them. Conicello testified Forty regularly made inappropriate comments about his sexual relationship with his

5

wife, his divorce, and other subjects. He once told a coworker she should let her daughter, who suffers from addiction, "just die." Forty complained about having to work during the pandemic and frequently disagreed with Conicello's management decisions.

Prior to June 2020, Forty made multiple complaints to Betty Sheridan, Chief Operating Officer of Inspira, and Sharon Slavic, Director of Nursing, about Conicello's use of foul language, verbal abuse, and belittling conduct. Slavic told Forty to discuss the matter directly with Conicello or file a report with HR, which he did not do. He alleged Slavic violated Inspira policy by not forwarding his complaints to HR herself. In addition, he alleged Slavic told Conicello about his complaints, which exacerbated the situation.

Jenkins and Karnuk also complained to Slavic about Conicello's conduct. In 2018, Karnuk filed a complaint alleging Conicello blocked a door and refused to let her leave a room while Conicello berated her. In 2020, Conicello screamed at Karnuk about an incorrect schedule, even though Karnuk had just returned from leave and had not prepared the schedule. Slavic, over the years, discussed the complaints with Conicello, but took no concrete action to address her behavior.

6

On June 24, 2020, Forty, Karnuk, and Jenkins were working in the staffing coordinators' office with Conicello working in her nearby office. Forty was complaining about a coworker's lack of productivity and Conicello's alleged refusal to address it. Conicello overheard Forty talking about the coworker's failure to complete reports and heard him say, "and let me guess, Barb didn't do anything about it."

Conicello immediately left her office, walked over to Forty's desk and, in front of the other employees and in a raised voice told Forty to "shut the fuck up" and that she "had enough of him complaining." According to Forty, Conicello continued to berate and humiliate him, while cursing in an aggressive manner. Conicello leaned physically close to Forty, her elbows on his desk and her face close to his, but did not touch him. Forty, a former member of the military and a physically imposing man, did not engage with the smaller statured Conicello during the encounter. According to Forty, Conicello said "you know what Carlos, every time you run to [Sheridan], you know what they do, they laugh at you. They fucking laugh at you. I'm sick of it. I'm sick of it." After returning to her office for some time, Conicello left the staffing coordinators' office for the remainder of the workday.

7

Karnuk witnessed the incident and was so uncomfortable she moved to the door. Shocked by the intensity of Conicello's behavior, Karnuk then left the room because she was afraid she might urinate out of fear. Jenkins also witnessed the incident and feared Conicello was going to strike Forty. Forty found it necessary to step away from the office to manage his stress.

That evening, Conicello called Forty to apologize. She explained that personal issues, combined with the pressures of the COVID-19 pandemic, caused her stress to boil over. Forty told Conicello not to worry about the encounter and that he understood her circumstances. He admitted he did not feel intimidated during the confrontation.

Conicello also called Jenkins that evening. She said, "I just called [Forty] and apologized to him. I can't act like that. And I need to get my shit together." Jenkins referred to the June 24, 2020 incident as the worst she has seen Conicello behave.

On June 26, 2020, Forty emailed Inspira's Chief People Person, Erich Florentine, to report the June 24, 2020 incident. He expressed his fear of returning to the office if Conicello was present. Florentine forwarded the email to Lambrecht. Jenkins reported the incident to Slavic. Karnuk never submitted a complaint about Conicello's treatment of Forty on June 24, 2020.

8

Lambrecht met with Forty. They discussed the June 24, 2020 incident and Lambrecht told Forty she would obtain a statement from Conicello and begin an investigation. At a subsequent interview, Conicello told Lambrecht Forty had repeatedly questioned her about something she needed him to accomplish and, after he refused to listen, she "got loud" with him.

Ultimately, Lambrecht considered Forty's instigation of the June 24, 2020 conflict similar to a prior incident in which he was involved and consistent with his past conduct. Forty had previously disobeyed an instruction from Slavic regarding the availability of N95 masks during the COVID-19 pandemic. Lambrecht found Conicello's conduct atypical and determined her supervisees, including Forty, did not consider her intimidating. Lambrecht informed executives at Inspira about the investigation and reported her conclusion she had no reason to suspect Conicello had committed any wrongdoing.

Separately, all staffing coordinators received the same base wage, except Rosilind Asselta, who received a higher base wage because of her many years of service. She had worked for Inspira longer than Forty. However, Forty "fixated" on his misconception that other staffing coordinators earned more than him. As a result, he repeatedly complained about his wages. Jenkins believed the staffing coordinators were underpaid.

9

Jenkins petitioned Conicello for COVID-19 incentive pay, sometimes referred to as premium incentive pay or PIP. During the pandemic, Inspira offered financial incentives like PIP to its frontline employees, such as nurses. Direct patient care staff received an additional amount per shift as incentive pay. Senior leadership at Inspira determined staffing coordinators were not eligible for COVID-19 incentive pay. Forty, however, thought staffing coordinators should be eligible for PIP during the pandemic. According to Lambrecht, Conicello sought incentive pay for her staffing coordinators several times but was denied on each occasion by senior management.

Inspira also offers "charge pay," a form of incentive pay, under certain circumstances to specified employees. Charge pay is an additional one dollar per hour on top of a given hourly rate. The charge nurse, to whom charge pay is generally applicable, is a designated registered nurse each shift who has additional responsibilities warranting the extra compensation. While non-nurses could in theory receive charge pay, such a decision would require director-level approval. Staffing coordinators, however, are ineligible for charge pay.

Forty once mistakenly received charge pay for a single pay period. The error was discovered by Jenkins after payroll had already been processed. When

Jenkins advised Conicello of her discovery, Conicello stated, "we will let it go this time" because the administrative effort to correct the error was immense.

Jenkins later approached Conicello about whether staffing coordinators could receive charge pay in lieu of their ineligibility for PIP. According to Conicello, she expressly denied Jenkins's request. Jenkins claims Conicello said the staffing coordinators could receive charge pay "as long as [she] doesn't get in trouble" for it.

In summer 2020, Asselta discovered plaintiffs had been approving charge pay on each other's time cards. She reported her discovery to Conicello on August 1, 2020. Conicello investigated and learned plaintiffs entered the charge pay on each other's behalf at approximately 11:00 a.m. each Monday before payroll closed for the pay period. The approvals were entered after Conicello reviewed their time cards the prior Sunday evenings.

Kronos records established that Jenkins entered charge pay on Forty's behalf thirty-two times over a period of two months, comprising five pay periods, from May 30, 2020 to July 25, 2020. Records also show that Jenkins entered charge pay on Karnuk's behalf fifteen times over two pay periods from July 11, 2020 to July 25, 2020. Jenkins does not dispute she entered the charge pay on behalf of Forty and Karnuk.

11

Forty entered charge pay on Jenkins's behalf thirty-five times over four pay periods from May 30, 2020 to July 11, 2020. He entered charge pay on Karnuk's behalf nine times for one pay period ending July 27, 2020. Forty does not dispute he entered charge pay on time cards for Jenkins and Karnuk. The record established Karnuk entered charge pay on Jenkins's behalf ten times for one pay period ending July 25, 2020.

Neither of the two other staffing coordinators under Conicello's supervision, Asselta and Ruhl, received charge pay. Conicello testified she would never have approved charge pay for only three of the five staffing coordinators under her supervision. In addition, she stated that had she approved charge pay for her employees she would have done so in writing.

On September 1, 2020, Conicello reported what she discovered to Lambrecht, who started an investigation. She interviewed each of the staffing coordinators about charge pay. Conicello was present for some of the interviews. Lambrecht and Conicello met with Asselta, who reported a conversation she had with Forty. When she asked Forty why Jenkins was receiving charge pay, Forty attempted to shift responsibility to management, stating that "higher uppers" would have more information. Lambrecht met with Ruhl, who reported she knew nothing about her coworkers receiving charge pay.

Lambrecht and Conicello also met with Karnuk. During the interview, Karnuk denied receiving charge pay and stated none of the staffing coordinators received charge pay. Karnuk acknowledged she was working on the day Kronos records show she approved charge pay for Jenkins. During the interview, Karnuk did not claim Conicello approved her receipt of charge pay or entry of charge pay on the time cards of other staffing coordinators. At her deposition, Karnuk admitted she had no first-hand knowledge of Conicello approving charge pay for any staffing coordinator.

Lambrecht also interviewed Jenkins. Jenkins was aware she received charge pay and acknowledged she never received confirmation from Conicello of its approval. Jenkins admitted that she, Forty, and Karnuk decided to approve charge pay for each other because she heard from Forty that they earned the least of the five staffing coordinators. At her deposition, Jenkins contradicted that statement, saying the three made their agreement to approve charge pay because they had extra duties during the COVID-19 pandemic. Jenkins claimed Conicello gave her permission to approve charge pay for herself, Forty, and Karnuk "as long as" Conicello did not "get in trouble." Jenkins claimed Christina Love, a nurse supervisor, was present when Conicello made that

13

statement.  Love, however, had no memory of Conicello saying that to Jenkins. Plaintiffs produced no other witnesses to Conicello's alleged statement.

During his interview with Lambrecht and Conicello, Forty admitted he was aware he was receiving charge pay.  He claimed the unauthorized charge pay was Jenkins's idea.  He stated he and Jenkins misinterpreted Conicello's non-answer to Jenkins's request for charge pay as permission to enter charge pay for each other.  Forty confirmed Conicello never saw the unauthorized charge pay entries because they were entered after she reviewed plaintiffs' time cards each pay period.

Based on Lambrecht's investigation, Inspira determined there was sufficient evidence to conclude the charge pay taken by plaintiffs was entered without authorization.  Inspira convened a "termination panel," which included Lambrecht, an Assistant Vice President for HR, in-house counsel, and Conicello.  No individual panel member had final-decision making authority. Thus, Conicello could not independently terminate an employee.

After considering Lambrecht's investigation report, the panel decided to terminate plaintiffs.  Conicello testified she was saddened by the decision and did not want to lose two-thirds of her staff during a pandemic.  However, she had no choice but to accept the decision.

A-4038-23

On September 14, 2020, Forty and Jenkins were terminated. Karnuk was terminated on September 17, 2020. They were informed their terminations were due to unauthorized entry of charge pay for other staffing coordinators resulting in the theft of hospital funds.

At his deposition, Forty admitted the unauthorized receipt of charge pay was grounds for termination and he had no evidence to dispute that his termination was for theft of hospital funds.

On September 10, 2021, Forty filed a complaint in the Law Division alleging two claims under CEPA: (1) retaliatory termination; and (2) unlawful retaliation. Forty alleged defendants launched the investigation into plaintiffs' approval and receipt of charge pay in retaliation for his complaint about Conicello's behavior on June 24, 2020. He alleged Conicello had approved the extra pay, which he characterized as de minimis. In addition, he alleged several unnamed Inspira managers and directors had been caught falsifying their time cards to receive thousands of dollars in extra compensation, but were not terminated for their behavior. Instead, the managers and directors only had to pay back the money "they stole from . . . Inspira." Forty alleged his termination for allegedly receiving a much smaller amount of unauthorized pay was retaliation for reporting what he perceived to be Conicello's unlawful behavior.

A-4038-23

Forty sought compensatory and punitive damages, as well as attorney's fees and costs.

Also on September 10, 2021, Karnuk and Jenkins filed complaints in the Law Division alleging essentially the same facts and causes of action alleged by Forty. They alleged their terminations were in retaliation for complaints they made over the years about Conicello, including Jenkins's complaint about the June 24, 2020 incident.

After the close of discovery, defendants moved for summary judgment in each of the actions. They argued plaintiffs cannot establish a violation of CEPA because: (1) the conduct they disclosed – Conicello's behavior on June 24, 2020 – could not objectively reasonably have been viewed by them as a violation of law; (2) Karnuk and Jenkins did not disclose the June 24, 2020 incident to a supervisor; and (3) even if plaintiffs can establish they disclosed what they objectively reasonably viewed as unlawful behavior to a supervisor, they cannot establish their terminations were a pretext and done in retaliation for their whistleblowing activity.

Plaintiffs opposed the motions. They argued they engaged in whistleblowing activity by disclosing what they objectively reasonably believed to be criminal harassment by Conicello on June 24, 2020. See N.J.S.A. 2C:33-

4(a) and (c). In addition, they argued they produced sufficient evidence on which a jury could find their terminations were a pretext and retaliation because other employees who engaged in theft of compensation were not fired and because their firing violated defendants' progressive discipline policy.

On July 15, 2024, the court issued an oral decision granting defendants' motions in each matter. The court found plaintiffs cannot establish they objectively reasonably believed Conicello's behavior on June 24, 2020 violated N.J.S.A. 2C:33-4(a) and (c). The court found Forty produced sufficient evidence to establish he felt berated in front of his coworkers, but it was objectively unreasonable for him to believe Conicello acted with the purpose to harass Forty, as required to constitute criminal harassment. The court also found plaintiffs produced insufficient evidence on which a jury could conclude the June 24, 2020 encounter was anything other than an unprofessional diatribe by a supervisor during a workplace dispute.

The court further found that while Forty and Jenkin reported the June 24, 2020 incident to supervisors, there is no evidence in the record that Karnuk engaged in whistleblowing. The court found being interviewed and truthfully reporting what you observed – the only things Karnuk did with respect to the June 24, 2020 incident – are insufficient to constitute protected whistleblowing.

That finding alone, the court concluded, justified entry of summary judgment in favor of defendants on Karnuk's claims.

Although the court found no jury could conclude Forty and Jenkins objectively reasonably believed Conicello engaged in illegal activity, in light of their reports of the June 24, 2020 incident to supervisors, the court examined whether plaintiffs produced sufficient evidence on which a jury could find their terminations were a pretext and retaliation for Forty's whistleblowing.

The court found, given the undisputed evidence that plaintiffs evaded Conicello's review each pay period by adding charge pay after she reviewed their time cards, "it really cannot be disputed that they were doing [so] to avoid detection . . . and during the chaos of COVID[-19], maybe they thought that they could get away with this, and did for a period of time." The court continued: "[T]he facts [of] how they went about approving this charge pay for each other really belies the assertion that it was approved by [Conicello] because had it been then it would've just been included in their regular pay that she would've approved."

In addition, the court found that Conicello did not unilaterally terminate plaintiffs. The decision was made by a panel of supervisors from various departments. In addition, the court noted that Forty was not the only person

terminated. The other two plaintiffs who participated in the extra compensation scheme also were discharged. The court concluded: "I don't think there are sufficient facts in this record that would permit a jury to see that as anything but a nondiscriminatory event."

On July 16, 2024, the motion court entered an order in each matter granting summary judgment to defendants on all claims.

These appeals follow. Plaintiffs argue the motion court erred because they produced sufficient evidence on which a jury could find they each engaged in whistleblowing and their terminations were a pretext for retaliation.

## II.

We review a grant of summary judgment de novo, applying the same standard as the motion court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that

A-4038-23

party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the motion court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

Self-serving assertions that are unsupported by evidence are insufficient to create a genuine issue of material fact. Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009). We review the record "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523-24 (1995).

The purpose of CEPA is to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). "CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to

effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214

N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431).

In pertinent part, CEPA provides:

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a.      Discloses, or threatens to disclose to a supervisor . . . an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
> (1)    is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>
> (2)    is . . . criminal . . . [or]
>
>         . . . .
>
> c.      Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1)    is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>
> (2)    is fraudulent or criminal, including any activity, . . . .
>
> [N.J.S.A. 34:19-3(a)(1) to (2) and (c)(1) to (2).]

Prohibited retaliatory action includes suspending or terminating an employee

from employment. N.J.S.A. 34:19-2(e); Donelson v. DuPont Chambers Works,

21

412 N.J. Super. 17, 29 (App. Div. 2010), rev'd on other grounds, 206 N.J. 243 (2011).

To establish a CEPA violation, a plaintiff must demonstrate that:

> (1)   he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2)   he or she performed a "whistle-blowing" activity described in [N.J.S.A.] 34:19-3(c);
>
> (3)   an adverse employment action was taken against him or her; and
>
> (4)   a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015).]

A plaintiff who brings a CEPA claim is not required to show their employer's conduct was actually fraudulent or illegal. See Dzwonar, 177 N.J. at 462. Rather, "the plaintiff simply must show that he or she 'reasonably believes that to be the case.'" Ibid. (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000) (internal quotation marks omitted)). However, "as a threshold matter" the court "must 'first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true.'" Id. at 463 (quoting Fineman v. N.J.

Dep't of Human Servs., 272 N.J. Super. 606, 620 (App. Div. 1994)). A mere disagreement with an employer's practice, policy, or activity is insufficient to defeat summary judgment. Young v. Schering Corp., 275 N.J. Super. 221, 236-37 (App. Div. 1994).

If a plaintiff establishes the statutory elements, the burden shifts back to the defendant to "advance a legitimate, nondiscriminatory reason for the adverse" employment action. Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005). "If such reasons are proffered, [the] plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39.

A plaintiff must "set forth facts that would support an objectively reasonable belief that a violation has occurred." Dzwonar, 177 N.J. at 464.

> [W]hen a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.
>
> [Ibid.]

Without a substantial nexus between the complained-of conduct and an identified law or public policy, summary judgment must be granted to the defendant. See Hitesman v. Bridgeway, Inc. 218 N.J. 8, 32 (2014) ("[A] pivotal component of a CEPA claim is the plaintiff's identification of authority in one or more of the categories enumerated in the statute that bears a substantial nexus to his or her claim.").

"Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." Allen v. Cape May Cnty., 246 N.J. 275, 290 (2021) (quoting Battaglia, 214 N.J. at 559). "[T]rial courts 'must be alert to the sufficiency of the factual evidence and to whether the acts complained of could support the finding that the complaining employee's belief was a reasonable one,' and 'must take care to ensure that the activity complained about meets this threshold.'" Chiofalo v. State, 238 N.J. 527, 543 (2019) (quoting Battaglia, 214 N.J. at 558).

After reviewing the motion record, in light of applicable legal standards, we conclude the motion court's orders granting summary judgment to defendants were sound. First, we agree with the court's conclusion Forty did not produce sufficient evidence to establish an objectively reasonable belief Conicello

24

committed criminal harassment on June 24, 2020. For a conviction of harassment under N.J.S.A. 2C:33-4, the actor must have had the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990)). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D. v. M.D.F., 207 N.J. 458, 487 (2011) (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). Common sense and experience may also inform a determination or finding of purpose. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)). "The mere exposure to profanity, though irritating to many people, is not necessarily indicative of an intention to harass." State v. Duncan, 376 N.J. Super. 253, 263 (App. Div. 2005).

While Forty need not have an attorney's understanding of the nuances of N.J.S.A. 2C:33-4(a) and (c) to objectively reasonably believe a supervisor's conduct violated the statue, it would not be objectively reasonable for him to

25

believe that a crime has occurred when one of the elements of the crime is absent. Nothing in the record suggests Conicello acted on June 24, 2020 with the purpose to harass Forty. All the evidence suggests Conicello acted in her capacity as Forty's supervisor to express her dissatisfaction with his complaints about working conditions and his interactions with her supervisors. Conicello's outburst, although inappropriate and unprofessional, was a work-related statement by a supervisor to a supervisee. No reasonable jury could conclude otherwise.

Because Forty cannot prove he had an objectively reasonable belief Conicello violated the criminal harassment statute, he also cannot prove he engaged in whistleblowing. For the same reasons, we agree with the motion court's conclusion Karnuk and Jenkins did not engage in whistleblowing with respect to the June 24, 2020 incident.

Although we need not reach the other prongs of the CEPA analysis, we note the record contains overwhelming evidence defendants terminated plaintiffs for a legitimate reason. Plaintiffs' claim Conicello approved their receipt of charge pay is belied by their actions. It is undisputed plaintiffs hid their approval of charge pay from Conicello each pay period. If, as plaintiffs claim, she had approved the extra compensation – in Forty's and Jenkins's view

26

by not answering a request for the extra pay – there would have been no need to enter the pay on their time cards each pay period only after Conicello had completed her review of the time cards. No reasonable jury could conclude their behavior was consistent with Conicello having approved the extra pay.

In addition, even if a jury accepted plaintiffs' questionable claim Conicello approved the extra pay as long as she did not "get in trouble," those circumstances also warranted plaintiffs' termination. By stating she could "get in trouble" if she approved charge pay for plaintiffs, Conicello would have acknowledged plaintiffs were not entitled to that extra compensation. Plaintiffs' purported agreement to manipulate the payroll approval process so Conicello could be insulated from having permitted them to obtain unauthorized compensation would itself justify their termination.

We agree with the motion court's conclusion the record would not permit a reasonable jury to conclude "retaliatory discrimination was more likely than not a determinative factor in the decision" to terminate plaintiffs. Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 293 (App. Div. 2001). Plaintiffs produced no "evidence of circumstances that justify an inference of retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995). In addition, while the terminations happened shortly after

the June 24, 2020 incident, "[t]emporal proximity, standing alone, is insufficient to establish causation."  Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002).

Finally, although not addressed by the motion court, the record established defendants' progressive discipline policy permitted Inspira to commence discipline at any level, including termination.  Plaintiffs' claim high-level employees were permitted to return pay they stole from Inspira was proven to be untrue.  Those employees submitted salary time sheets tracking their time off, which resulted in PTO being retroactively deducted from their bank of PTO hours.  They did not receive compensation to which they were not entitled.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-4038-23